UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THOMAS CLARK,

        Plaintiff,

    v.

NANCY A. BERRYHILL,

        Defendant.

Case No. 17-cv-00371-JCS

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 16, 19

## I.  INTRODUCTION

Plaintiff Thomas Clark brought this action seeking judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his application for supplemental security income under Title XVI of the Social Security Act.  Clark argues that the administrative law judge ("ALJ") committed reversible error when he improperly evaluated: (1) the medical evidence in the record; (2) Clark's credibility as well as the credibility of Clark's mother; (3) Clark's residual functional capacity; and (4) Clark's severe impairments.  Pl's Mot. (dkt. 16) at 8–22.  The parties have filed cross motions for summary judgment pursuant to Civil Local Rule 16-5.  For the reasons stated below, Clark's motion is GRANTED, the Commissioner's motion is DENIED, and the case is REMANDED for an award of benefits.[1]

## II.  BACKGROUND

### A.  Procedural History

On September 30, 2012, Clark applied for supplemental security income for alleged disability beginning on December 15, 2007.  Administrative Record ("AR," dkt. 15) at 167–74.  Clark's claims were initially denied on July 23, 2013, and they were denied upon reconsideration

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

on February 10, 2014. *Id.* at 94–108, 110–29. Clark filed a written request for a hearing before an ALJ on March 20, 2014. *Id.* at 144. Clark appeared and testified at the hearing before ALJ Bradlee S. Welton ("ALJ Welton") on May 15, 2015. *Id.* at 47–92. Clark was represented by Kyle Kitson, an attorney. *Id.* Impartial vocational expert Robert Cottle ("VE Cottle") also testified at the hearing. *Id.* On November 5, 2015, ALJ Welton issued an unfavorable decision, finding that Clark was not disabled under § 1614(a)(3)(A) of the Social Security Act. *Id.* at 16–32. Clark requested review of ALJ Welton's decision, which the Social Security Administration Appeals Council denied on December 5, 2016, finding "no reason under [its] rules to review [ALJ Welton's] decision." *Id.* at 1–3. Clark filed a complaint on January 24, 2017, seeking judicial review by this Court. Complaint (dkt. 1) at 2. Pursuant to Civil Local Rule 16-5, Clark filed a motion for summary judgment, and the Commissioner filed a cross-motion for a summary judgment. *See* Pl.'s Mot.(dkt. 16); Comm'r's Mot. (dkt. 19).

**B. Clark's Background**

**1. Personal History**

Clark was born in Hartford, Connecticut, on March 10, 1965. AR 595. He was raised in Livermore, California. *Id.* Clark was expelled from high school "for fighting and drug charges." *Id.* He obtained a general equivalency diploma when he was in the California Youth Authority. *Id.* at 980. Clark worked as a mechanic, a carpet layer, a repossessor, and as a roofer. *Id.* at 556. He was incarcerated numerous times for domestic violence, false imprisonment, burglary, rape, sexual battery, and other crimes. *Id.* at 595, 981. He is married, but he is separated from his wife. *Id.* at 595. Clark has three children. *Id.*

**2. Medical History**

**a. Injuries, Mental Illness, and Substance Abuse**

Clark has sustained multiple injuries. He sustained a head injury "sometime before he was 10 [years of age] after a fall." *Id.* at 980. Clark "reported that he has been in several motorcycle accidents over the years and he has sustained multiple broken bone and head injuries." *Id.* In 2003, Clark sustained nerve damage when he fell from a roof. *Id.* at 561. In 2012, Clark suffered from a MRSA infection in his right hand after punching a mirror, and needed to have an abscess in

2

his hand drained. *Id.* at 602, 638, 654, 657–58. In 2013, he visited ValleyCare Medical Center's emergency department after accidentally hitting his left shin with a sledgehammer "while breaking down metal." *Id.* at 613. He also visited the same emergency department in 2013 on a separate occasion, reporting sharp pain in his right knee while lifting an engine into his car. *Id.* at 615. Clark has reported that he has arthritis, high blood pressure, pain in his back, hip, and shoulder, and mobility issues. *Id.* at 561. He has used a cane with his right hand to help him walk, and he was given a temporary accommodation to use a cane while in custody in 2010. *Id.* at 388, 566, 601, 699. He has also used a wheelchair, a walker, and a brace on his right knee to assist with mobility issues. *Id.* at 728, 733, 746, 834, 866, 887–88. The record also indicates that Clark is hard of hearing in his left ear. *Id.* at 484, 491.

Clark has a history of mental illness and substance abuse. He has reported that he suffers from insomnia, dysphoria, depression, paranoia, auditory and visual hallucinations, and irritability in social interactions. *Id.* at 367–368, 373, 380, 718. Clark has a history of methamphetamine use, with periods of abstinence as well as recent relapses. *Id.* at 367, 370, 382, 385, 705. He has reported feelings of paranoia stemming from his years of drug abuse. *Id.* at 376, 382, 385. Progress notes from while Clark was incarcerated indicate that a psychiatrist re-classified him to "'mental' status because of ongoing vulnerability, paranoia, and adjustment difficulties socially." *Id.* at 381. Clark attempted suicide in March 2010. *Id.* at 350.

The summary below first addresses medical records from Clark's various periods of incarceration, before turning to records from non-penal medical providers.

### b. Prison Medical Records

#### i. Records from Santa Rita Jail: May 2004–July 2010

In 2004, Clark underwent an x-ray exam for low back pain. *Id.* at 459. P. Perkins, M.D., noted that there was a "moderate compression fracture of T-8" of Clark's thoracic spine. *Id.* Physicians' orders from Prison Health Services Incorporated in 2005 state that Clark was prescribed Percogesic, a painkiller, on numerous occasions. *Id.* at 423–25. A medical information transfer form from San Quentin Prison to the Alameda County Sheriff's Office in 2006 states that Clark suffered from an umbilical hernia, urinary incontinence, and low back pain. *Id.* at 408.

United States District Court
Northern District of California

Records from Alameda County Behavioral Health Care Services' Criminal Justice Mental Health Care Program in 2006 state that Clark exhibited paranoia that started with his methamphetamine use. *Id.* at 466. Clark indicated that he expected the paranoia to subside when he stopped abusing methamphetamine, but the paranoia continued even after he abstained from drug use. *Id.* The report states that Clark's "paranoia has caused him to become reclusive and he has lost jobs [because] he doesn't show up." *Id.* It further states that Clark "tries to avoid contact whenever possible." *Id.*

A progress note from Alameda County Department of Behavioral Health Care Services Mental Health Division in 2006 states that Clark was referred to a psychiatrist due to "paranoia," and that he reported that he was "paranoid just as if he has been using meth recently" even though Clark had been clean for five years. *Id.* at 385. The medical evaluator indicated that Clark took Ditropen for his history of "incontinence likely due to disc disease of back" and that he also took Percogesic. *Id.* The medical evaluator further noted that Clark "[a]voids others," is "hypersensitive to criticism," and that his "[p]aranoia escalates after seeing known drug addicts." *Id.* The medical evaluator found that Clark was not "clinically depressed" but that Clark had "chronic insomnia." *Id.* The evaluator diagnosed Clark with: (1) "Psychosis NOS"[2]; (2) "R/O[3] amphetamine induced psychotic disorder"; and (3) "Amphetamine dependence." *Id.* The evaluator prescribed Risperidone 1 mg for Clark's "delusional disorder." *Id.*

Physicians' orders from Santa Rita Jail in 2007 indicate that Clark was allowed to use a cane for appointments for court appearances. *Id.* at 388. E. Mastroianni, RNP, signed an office special request that provided Clark with access to a handicap shower in 2008. *Id.* at 390.

In a progress note from May 2009, Mcheko Graves-Matthews, M.D., noted that Clark was in a wheelchair, but he could "ambulate minimally with a cane." *Id.* at 382. In terms of

---

[2] "'NOS' is a short-form for the diagnosis of 'not otherwise specified.'" *Wright v. Astrue*, 624 F. Supp. 2d 1095, 1103 n.3 (N.D. Cal. 2008). It "is a category for disorders that include symptomatology . . . about which there is inadequate information to make a specific diagnosis or about which there is contradictory information, or disorders with psychotic symptoms that do not meet the criteria for any Psychotic Disorder." *Id.* (citing American Pyschiatric Association Diagnostic and Statistical Manual of Mental Disorders 4th Ed., Section 298.9 (2000)).

[3] "R/O" is an abbreviation for "rule out." *See Cha Yang v. Comm'r of Soc. Sec.*, 488 F. App'x 203, 205 (9th Cir. 2012).

medications, Dr. Graves-Matthews noted that Clark took "Naprosyn/Baclofen" while incarcerated and that Clark took "Percoset and Oxycontin" when released from prison. *Id.* Dr. Graves-Matthews indicated that Clark did not receive medical treatment when outside of prison because he did not have medical insurance. *Id.* Dr. Graves-Matthews noted that Clark complained of "paranoia much like when he was using meth[amphetamine]" and that Clark "had this same complaint" when seen by another doctor in 2006. *Id.* Dr. Graves-Matthews diagnosed Clark with: "I-292.2 Amphetamine-related Disorder, NOS/304.40 Amphetamine Dependence, in long term remission II-Def III-Chronic pain." *Id.*

Raymond Carlson, a psychiatric social worker, spoke to Clark and also spoke to Dr. Graves-Matthews later in May 2009. *Id.* at 381. According to Carlson, Clark reported that he felt worse than he felt at his screening earlier that month. *Id.* Carlson noted that Clark's "presentation continue[d] to be flat, with speech that seem[ed] constricted." *Id.* Dr. Graves-Matthews reclassified Clark to the mental unit, increased Clark's dosage of Risperdal, and increased Clark's dosage of Benadryl. *Id.*

In June 2009, Clark saw Carlson and Dr. Graves-Mathews. *Id.* at 380. Clark reported having visual hallucinations, namely seeing "gremlins in [his] cell." *Id.* Clark further reported increased paranoia since he started taking a higher dose of Risperdal, as "if someone [were] behind him." *Id.* Dr. Graves-Matthews further noted that Clark's sleep "minimally improved."

Clark saw Carlson and Dr. Graves-Mathews again in July 2009. *Id.* at 379. Carlson noted that "although [Clark's] paranoia persist[ed], his psychotic symptoms ha[d] decreased." Carlson further noted that Clark's "presentation appears more focused than previously was the case, and seems more relaxed." *Id.* Clark also reported that he continued to experience insomnia. *Id.* at 379.

A progress note by Dr. Graves-Matthews in October of 2009 states that Clark was "rearrested after 37 days" and that he did not have any medications since he was last incarcerated. *Id.* at 376. Dr. Graves-Matthews noted that Clark's symptoms "do[] not sound like akathisia"[4] and

---

[4] "Akathisia is 'a condition of motor restlessness in which there is a feeling of muscular quivering, an urge to move about constantly, and an inability to sit still, a common extrapyramidal side of

that Clark continued to complain of "paranoid feelings and what he calls 'crank critters,' i.e., shadows and tracers from years of drug abuse." *Id.* Dr. Graves-Matthews diagnosed Clark with "I-292.2 Amphetamine related disorder, NOS/304.40 Amphetamine dependence, in long term remission II-Def III-Chronic pain (back/hip). *Id.* Dr. Graves-Matthews also noted that Clark agreed to try Geodon and Benadryl. *Id.*

In a progress note from November 2009, Dr. Graves-Matthews noted that Clark complained of "irritability and anxiety" and "report[ed] that Zoloft has been effective for this in the past." *Id.* at 374. Dr. Graves-Matthews discontinued Clark's prescription of Benadryl, continued Clark's prescription of Geodon, and restarted Clark's prescription of Zoloft. *Id.*

Dr. Graves-Matthews indicated in an April 2010 progress note that Clark reported that he was not experiencing paranoia but complained of depression, and that Clark suffered from chronic pain "from several accidents" and took the Elavil "for pain" and "Lisinopril/HCTZ for hypertension." *Id.* Dr. Graves-Matthews diagnosed Clark with: "I-311 Depressive Disorder, NOS/304.4 Amphetamine Dependence, in remission II-Def III HTN/Chronic pain." *Id.*

Clark returned to prison in July 2010. At his initial screening, the clinician noted that Clark was "eager to continue [his] med[ication] for depression and [auditory hallucinations] (critical voices)." *Id.* at 790. The clinician found that Clark had a Global Assessment of Functioning ("GAF") score of 49. *Id.* Later that month, Dr. Graves-Matthews saw Clark and noted that Clark complained of insomnia and dysphoria. *Id.* at 788. Dr. Graves-Matthews diagnosed Clark with: "I-311 Depressive Disorder, NOS/304.4 Amphetamine Dependence, in remission II-Def III-HTN/Chronic pain." *Id.*

### ii. Records from San Quentin State Prison: August 2010

In August 2010, Doreen Leighton, M.D., completed Clark's chronic care intake report at San Quentin State Prison. *Id.* at 677. Dr. Leighton's examination notes indicate that Clark "walk[ed] with a limp on the right and appear[ed] to be in significant pain." *Id.* at 678. Dr. Leighton also observed that Clark was using a cane during the exam and that Clark was "more

effect of neuroleptic drugs.'" *Tagger v. Astrue*, 536 F. Supp. 2d 1170, 1174 n.9 (C.D. Cal. 2008) (quoting *Dorland's Illustrated Medical Dictionary*, 42 (29th ed. 2000)).

comfortable sitting" down. *Id.* Dr. Leighton did not perform a "full neurologic examination." *Id.* Her plan for Clark included that he: (1) continue his medication for hypertension, namely Lisinopril; (2) receive a ground floor bunk as well as "a shower with workers" so as to ameliorate his chronic pain and mobility disorder; and (3) continue his psychiatric mediations, including while on parole. *Id.*

G. Jeffers, M.D., saw Clark in August 2010. *Id.* at 713. Dr. Jeffers noted that Clark was not in any apparent distress and that he was alert and cooperative. *Id.* Dr. Jeffers further noted that Clark presented with a "[s]light dysphoric mood and affect." *Id.* Dr. Jeffers also found that Clark's "memory and cognition" were "within normal limits." *Id.* On Axis I,[5] Dr. Jeffers diagnosed Clark with "R/O Major depression with psychotic features." *Id.* For Axis II, Dr. Jeffers deferred diagnosis. *Id.* For Axis III, Dr. Jeffers diagnosed Clark with "HTN left sided numbness." *Id.* For Axis IV, Dr. Jeffers noted incarceration. *Id.* For Axis V, Dr. Jeffers concluded that Clark had a GAF of 50. *Id.*

### iii. Records from Santa Rita Jail: May 2011–February 2015

At Santa Rita Jail, Clark saw Carlson in May 2011 and "report[ed] spells of uncontrollable crying, plus lapses of consciousness, anxiety, attacks with difficulty breathing, and anger triggered from the crying bouts." *Id.* at 785. He further reported having been incarcerated for two weeks

---

[5] The court in *Nguyen v. Astrue* explained physicians' diagnoses based on this system as follows:

> The American Psychiatric Association's Multiaxial Assessment is set forth in the Diagnostic and Statistical Manual of Psychiatric Disorders, ("DSM-IV") (4th Ed. 2005), at pp. 23–37:
> Axis I: Clinical Disorders
>      Other Conditions That May Be a Focus of Clinical Attention
> Axis II: Personality Disorders
>      Mental Retardation
> Axis III: Medical Conditions
> Axis IV: Psychosocial and Environmental Problems
> Axis V: Global Assessment of Functioning ("GAF").
> The GAF Scale "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Id.* at 34.

No. CIV S-07-1372 (EFB), 2009 WL 747321, at *4 n.9 (E.D. Cal. Mar. 20, 2009). *See also Salazar v. Colvin*, No. C-11-03840 (RMW), 2014 WL 3728453, at *4 n.5 (N.D. Cal. July 28, 2014) (explaining in detail the "five axes in the DSM Diagnostic system" and how they "each relat[e] to a different aspect of a mental disorder").

1    and that he was without medication for two weeks before that time.  *Id.*  Later in May, Clark saw

2    Jennifer Chaffin, M.D., who found that Clark suffered from depression and anxiety.  *Id.* at 780.

3        In a progress note from June 2011, Dr. Chaffin noted that Clark reported mild anxiety and

4    that he was experiencing symptoms of lethargy and fatigue.  *Id.* at 778.  Dr. Chaffin found that he

5    was "somewhat dysphoric" concerning "his case."  *Id.*  Dr. Chaffin continued to prescribe all of

6    Clark's medications, with the exception of Risperdal.  *Id.*  Later in June, Bonnie Cook, MFT, saw

7    Clark.  *Id.* at 777.  Clark reported that "he ha[d] been feeling on edge, having nightmares,

8    insomnia, and 'can't have people behind him.'"  *Id.*  Clark further reported that "his mood ha[d]

9    worsened."  *Id.* at 777.  Cook concluded that Clark's mood "appeared slightly more flat than

10   usual" but that he was "calm and cooperative."  *Id.*

11       In July 2011, Clark saw Dr. Chaffin and reported that he was having problems sleeping

12   and had been paranoid, and that "he can't stand having people behind him."  *Id.* at 776.  Dr.

13   Chaffin found that Clark's mood and affect were "anxious."  *Id.*  Just over two weeks later, Cook

14   noted that Clark reported "a new symptom," namely a "feeling like bugs [were] crawling in his

15   skin."  *Id.* at 775.  Cook found that Clark's affect was "depressed with controlled irritability."  *Id.*

16   Two days later, Clark reported to Dr. Chaffin that he was experiencing insomnia and restlessness.

17   *Id.* at 774.  Dr. Chaffin noted that Clark was "on edge" but also indicated that this could be

18   attributed more to anxiety than paranoia, as Clark's prescriptions for "antipsychotics have really

19   helped."  *Id.*

20       A progress note from August 2011 indicates that Clark reported "ongoing anxiety,"

21   "paranoia," and being "on-edge," as well as urinary hesitancy.  *Id.* at 773.  Dr. Chaffin noted that

22   Clark's reported "'paranoia' [did] not appear delusional in nature."  *Id.*  Rather, Dr. Chaffin found

23   that Clark's symptoms appeared to more closely resemble "social anxiety."  *Id.*  Dr. Chaffin

24   discontinued Clark's prescription of Trileptal and also ordered that Clark wean himself off of

25   Remeron.  *Id.*  Five days later, Cook noted that Clark's mood had improved, although he was still

26   experiencing paranoia, urinary hesitancy, and insomnia.  *Id.* at 771.

27       In September 2011, Clark reported to Dr. Chaffin that he was still anxious but was "better

28   overall."  *Id.* at 770.  He further reported that his symptoms of akathisia had decreased, but he was

8

still having trouble sleeping. *Id.* Later in September, Clark reported at a follow up visit that he was "still not sleeping well" but that "his mood [was] pretty stable." *Id.* at 769.

At a follow up appointment in October 2011, Clark reported that he was still having difficulty sleeping due to anxiety. *Id.* at 767. In a progress note from November 2011, Dr. Chaffin noted that Clark "[o]verall appear[ed] to be at ease" despite a mix of life stressors. *Id.* at 764. Clark reported that he "ha[d] been sleeping 'like a baby.'" *Id.* At a follow up later that month, however, Clark reported "worsened" symptoms of insomnia, anxiety, and depression due to increased "family stressors." *Id.* at 763. Dr. Chaffin noted that Clark's affect was "dysphoric/worried" and that his mood was "not good." *Id.*

In December 2011, Clark "report[ed] bouts of uncontrollable crying" and that he was having trouble sleeping. *Id.* at 760. Clark also indicated that "he didn't notice a difference" when he stopped taking Depakote for two days and asked to discontinue that drug. *Id.* Dr. Chaffin replaced Clark's prescription for Depakote with Lamictal. *Id.* At a follow up later that month, Clark reported no improvement on Lamictal concerning his insomnia and anxiety. *Id.* at 759. Clark further reported that he was "accidentally [given] a Zyprexa, which helped him sleep." *Id.* Dr. Chaffin discontinued Clark's prescription for Depakote and prescribed Clark Zyprexa "for mood/sleep augmentation." *Id.*

In January 2012, after additional changes to his medication, Clark reported that he was feeling "pretty good." *Id.* at 756, 758. He further reported that his sleep was "somewhat improved but could be better." *Id.* Dr. Chaffin noted that she "explained the process" of how Clark will get medications upon his release the following month, which ameliorated Clark's nervousness. *Id.* In late January 2012, Clark saw Cook and remarked that he was scheduled to be released on February 10, 2012, explaining that he "took a deal for 5 years [of] probation w[ith] time served so he could get out [and] see his parents who are in the hospital." *Id.* at 755. In early February 2012, Dr. Chaffin wrote prescriptions for Clark's medication upon his release. *Id.*

Clark was out of custody for two months and was re-incarcerated after he violated a restraining order. *Id.* at 750. Sharmaine Roberts, a psychiatric social worker, conducted Clark's initial screening on May 7, 2012. *Id.* at 752. Clark reported compliance with his medications

9

while he was released from prison.  *Id.*  Cook noted at a subsequent medical examination the following week that Clark was "very irritable" and "impatient" but that he was "in control."  *Id.* at 750.  The following day, Dr. Chaffin saw Clark, and Clark reported that "he was getting treatment at Axis [Community Health] while out of custody," including getting his prescriptions refilled.  *Id.* at 748.  Clark nevertheless reported that he had been without medications for over a week, he was having trouble sleeping, he was having "difficulty in the community," and he was having trouble remembering his appointments.  *Id.*

Clark returned to jail in January 2014.  Jonathan Oakes, LMFT, a behavioral health clinician, noted at an initial screening that Clark was "very upset" and "crying" because he was separated from his dog and his wife.  *Id.* at 716.  Clark reported that he had not been on medications since he was last incarcerated.  *Id.*  Oakes indicated that Clark was in the infirmary due to his use of a brace.  *Id.*  Oakes provisionally diagnosed Clark as "311 Depressive D/O NOS" and as having "300 Anxiety D/O NOS," with a GAF of 50.  *Id.*  Three days later, Sarah Ulloa, MFT, noted that Clark was in a wheelchair, although he sometimes used a cane or a brace.  *Id.* at 718.  Ulloa found that Clark was a "poor historian."  *Id.*  Clark reported that he was experiencing auditory hallucinations, which he described "as a man's voice yelling at him, calling him no good."  *Id.*  Ulloa referred him to a doctor for a medical evaluation.  *Id.* at 719.  That same day, Dr. Graves-Matthews determined that because Clark was "a fall risk and will be traveling" for court appearances, he would restart Clark on his medications at lower doses.  *Id.* at 720.  Dr. Chaffin restarted Clark's full medication regimen the following day.  *Id.* at 721–22.

Jose Aramburo, M.D., noted that Clark refused to have an x-ray of his right knee to assess Clark's need for a knee brace.  *Id.* at 891–92, 910, 947.  Clark had an x-ray of his lumbar spine, however, and Michael Maiman, M.D., indicated that there was "satisfactory alignment and mineralization."  *Id.* at 929.  Dr. Maiman further noted that there was "[n]o evidence of spondylosis or spondylolisthesis" and that the "[d]isc spaces appear normal."  *Id.*  Moreover, Dr. Maiman indicated that there was "[n]o evidence of fracture."  *Id.*  Dr. Maiman's impression was "[t]ransitional S1 lumbosacral vertebra, which may be symptomatic."  *Id.*

In February 2014, Ulloa saw Clark and noted that he was "wheelchair bound," although

10

Clark also reported that he "could do limited walking with a walker." *Id.* at 728. Ulloa further noted that Clark "presented as depressed with a flat affect" and that Clark was "cooperative during the interview." *Id.* While Clark's speech was "slow," Ulloa found that he "appear[ed] to be proactive in seeking treatment for his current situation." *Id.* Later that month, Clark was "unable to ambulate" after he fell when he attempted to use a pick-up walker as a front wheel walker, thinking "a pick-up walker would slide like a [front wheel walker]." *Id.* at 866. Rodney Silveira, PT, noted that Clark's plan was "pending" to receive a front wheel walker. *Id.* At a follow up for a front wheel walker, Clark indicated that he was not using the front wheel walker because his "lawyer told [him] not to listen to doctors here [at Santa Rita Jail]." *Id.* at 864, 888. I-Fei Chen, M.D., further noted that Clark refused an x-ray because Clark's lawyer "told [him] not to" get one. *Id.* at 864. Dr. Chen noted that Clark could "walk with [a front wheel walker] about 20 feet, then states that his arms are tired and [that] [he] wants to sit in his wheelchair." *Id.* Concerning Clark's mental state, Dr. Chen noted that Clark had a "flat affect" with "poor judgment." *Id.* Dr. Chen "encouraged [Clark] to increase walking every day in tolerable increments." *Id.*

In March 2014, Glenda Newell-Harris, M.D., saw Clark, and Clark "complain[ed] of swelling in [his] right leg for the past month." *Id.* at 861. Clark indicated that he would rather continue using a wheelchair than a walker, as "he has broken two walkers because he does not know how to use them." *Id.* Clark declined physical therapy to learn how to use a walker. *Id.* A week later, Clark reported that he fell on top of his walker in the dining area. *Id.* at 863. At an appointment the following day, Clark "stated he use[d] to wear a brace on his [right] knee" but that "he can't wear it because it contains metal." *Id.* at 862. Clark further stated that "he received a wheelchair instead," he was unable to "bear full weight" on his right leg, and that his right leg "swells every day." *Id.*

In April 2014, Oakes saw Clark, and Clark reported that he was "having trouble with hearing voices and seeing shadows." *Id.* at 733. He explained that, when not incarcerated, he would use marijuana to "cope" with his symptoms, and that, without marijuana, his symptoms were worse. *Id.* Clark expressed interest in seeing a psychiatrist. *Id.* The following day, Khenu Singh, M.D., saw Clark, and Clark indicated that he has been having "problems with anger that

11

seem to be triggered 'out of the blue.'" *Id.* at 734. Dr. Singh adjusted Clark's medications multiple times over the following months. *Id.* at 734–37.

In June 2014, Janet R. Sachdev, M.D., saw Clark, and Clark reported that he was "doing alright" and that his medications were "working." *Id.* at 741. Clark further reported that he was "eating and sleeping well." *Id.*

Clark returned to prison in February 2015. At his initial screening, the evaluator noted that Clark "seemed to be in pain" and that he "[s]eemed vague" about the psychiatric medications he was taking. *Id.* at 746. The evaluator contacted the pharmacy and found that there were "no recent psych[iatric] med[ications] per staff report." *Id.* Later that month, Clark suffered from "atypical pneumonia" and was prescribed Bactrim. *Id.* at 807. Khin Tha, M.D., noted that Clark was "[c]leared to go back to [the] Housing Unit" and that "[i]n [Clark's] chart, there [was] a notation by Dr. Slabaugh last year in Feb[ruary] 2014 that [Clark] was to wean off the [leg] brace." *Id.*

### c.   Other Medical Records

#### i.   Records from the John George Psychiatric Pavilion: March 2010

An intake evaluation form by Jasdeep Aulakh, M.D., at the John George Psychiatric Pavilion in San Leandro, California, from March 2010 indicates that Clark was transferred from Valley Medical Center "for a reported [s]uicidal attempt." *Id.* at 350. Drug testing showed that Clark had relapsed, as he tested positive for methamphetamine use. *Id.* Clark reported that he had used methamphetamine two days earlier on his birthday and that he had been consuming alcohol on the date of the exam. *Id.* He also "denied paranoid ideation or auditory hallucinations." *Id.* Dr. Aulakh discharged Clark to return home. *Id.* For Axis I, Dr. Aulakh diagnosed Clark with: (1) "292.9 Amphetamine - Related Disorder NOS," "305.00 Alcohol Abuse," and "311 Depressive Disorder NOS." *Id.* at 351. Dr. Aulakh deferred diagnosis as to Axis II. With respect to Axis III, Dr. Aulakh wrote "none acute." *Id.* For Axis IV, Dr. Aulakh wrote "Code I P[sychiatric] E[mergency] S[ervices] Evaluation." *Id.* For Axis V, Dr. Aulakh found that Clark had a GAF of 55 in the past year. *Id.* In an exit disposition form, Dr. Aulakh noted that Clark again "denied paranoid ideation or auditory hallucinations, and that Clark "denied any suicidal

thoughts" and "voice[d] motivation for sobriety." *Id.* at 352.

### ii. Feng Bai, M.D.

Feng Bai, M.D., conducted a complete orthopedic evaluation of Clark on March 16, 2011. *Id.* at 561–67. Dr. Bai reviewed records by Dr. Leighton from San Quentin State Prison. *Id.* Clark reported that he was not currently taking any pain medication, his treatment "had not helped at all," and he was "still feel[ing] constant sharp pain in the low back and right hip and also the neck, left hand, knee, and right foot." *Id.* at 562. Concerning Clark's station and gait, Dr. Bai noted that Clark:

> ambulated with [a] cane in [his] right hand with antalgic gait [i.e., a gait modified to avoid pain]. He is unable to do tiptoe and heel walking, but he reported low back pain and right leg weakness, but ambulated without footdrop. He is able to ambulate without a cane in the examining room with antalgic gait. He is sitting comfortably without difficulty. He is able to go up and down the exam table, change position by himself, but moving slightly slow due to the reported pain.

*Id.* at 563. Dr. Bai found that Clark's "symptoms and physical examination are consistent with chronic low back pain with probably degenerative disk disease and possible right radicular pain and right foot arthritis or gout-type pain." *Id.* at 566. Dr. Bai concluded that Clark was:

> able to carry and lift 20 pounds occasionally and 10 pounds frequently. He is able to stand and walk six hours of an eight-hour workday and sit for six hours of an eight-hour workday. No pushing or pulling limitations other than carrying and lifting. Due to his low back pain, right foot pain, and right hip, he reported pain and weakness. He had postural limitations. He is able to do occasional climbing, stooping, kneeling, and crouching. No manipulation limitation in bilateral upper extremities for reaching all directions, doing gross or fine manipulation. Due to his low back pain and right pain for every two hour constant standing and walking, he should be allowed to change position and is allowed to change his sitting position for 10 to 15 minutes to relieve the symptom. He had no visual, communicative, or environmental limitations. He should be allowed to use the cane to assist ambulation and for longer ambulation and also when the claimant is walking on uneven surface[s]. He should be able to use the cane for less than two hours in an eight hour workday.

*Id.* at 567.

United States District Court
Northern District of California

13

### iii. Records from ValleyCare Medical Center Emergency Department and Axis Community Health: October 2012 and March 2013

In October 2012, Clark was admitted "for complex right hand cellulitis and a possible abscess" after he punched a mirror several days earlier. *Id.* at 638, 651. He received surgery at the ValleyCare Medical Center and later visited Axis Community Health for surgical debridement of a MRSA infection in his hand. *Id.* at 657–58, 1000–01.

In March 2013, Clark returned to ValleyCare for "right index finger pain and swelling with history of remote injury to the finger requiring surgery." *Id.* at 633. Clark reported that he had "chronic swelling and decreased range of motion" and that he had "failed to follow up" with a primary care physician or orthopedist after his surgery. *Id.* A splint was applied to Clark's fifth right finger, and he was prescribed Vicodin for pain. *Id.* at 633, 636.

### iv. Records from Axis Community Health and Divya Raj, M.D.: April 2013

In April 2013, Clark sought treatment at Axis Community Health for his chronic back pain and assistance with his disability paperwork. *Id.* at 584. Divya Raj, M.D., is listed as Clark's primary care provider, but Edward Liu, N.P., was Clark's current provider for his April 22, 2013 visit. *Id.* Liu appears to have recommended that Clark get an x-ray of his lower spine. *Id.* at 587.

On April 26, 2013, Dr. Raj saw Clark "to fill out [Clark's] disability paperwork," *id.* at 589, and performed a mental capacity assessment, *id.* at 579–81. Concerning Clark's memory and capacity for understanding, Dr. Raj found that Clark had slight limitations in his "ability to remember locations and work-like procedures" as well as his "ability to understand very short and simple instructions." *Id.* at 579. Dr. Raj also found that Clark had a moderate limitation with respect to his "ability to understand and remember detailed instructions." *Id.* In making these determinations, Dr. Raj had Clark recall "certain things" and asked Clark "about situations such as grocery shopping and his ability to remember." *Id.*

Concerning Clark's capacity for sustained concentration and persistence, Dr. Raj found that Clark did not have any limitations with respect to his "ability to make simple work-related decisions." *Id.* at 580. Dr. Raj also found that Clark had slight limitations with respect to his "ability to carry out very short and simple instructions" as well as his "ability to sustain an ordinary routine without special attention." *Id.* at 579. Dr. Raj determined that Clark had

moderate limitations regarding his "ability to carry out detailed instructions," his "ability to maintain attention and concentration for extended periods," and his "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." *Id.* Dr. Raj also found that Clark had marked limitations concerning his "ability to work in coordination with or in proximity to others without being distracted by them," his "ability to complete a normal workday without interruptions from psychologically based symptoms," his "ability to complete a normal workweek without interruptions from psychologically based symptoms, and his "ability to perform at a consistent pace with a standard number of length and rest periods." *Id.* at 580. In support of these determinations, Dr. Raj noted that Clark suffered from bi-polar disorder, anxiety, and "anger issues." *Id.* Dr. Raj further noted that Clark "tends to isolate himself" and that Clark has difficulty working with others without becoming irritated or angry. *Id.*

With respect to Clark's capacity for social interaction, Dr. Raj found that Clark had a slight limitation concerning his "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." *Id.* Dr. Raj also found that Clark had a moderate limitation with respect to his "ability to accept instructions and respond appropriately to criticism from supervisors." *Id.* Concerning Clark's "ability to ask simple questions or request assistance," Dr. Raj found Clark had a marked limitation. *Id.* Dr. Raj also found that Clark had extreme limitations with respect to his "ability to interact appropriately with the general public" as well as his "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." *Id.* In support of these findings, Dr. Raj noted that Clark has "a lot of anger [and] social anxiety, which leads to poor interaction in social situations." *Id.*

Concerning Clark's capacity for adaptation, Dr. Raj found that Clark had no limitations regarding his "ability to be aware of normal hazards and take appropriate precautions." *Id.* at 581. Dr. Raj determined, however, that Clark had slight limitations with respect to his "ability to respond appropriately to changes in the work setting" as well as his "ability to set realistic goals or make plans independently of others." *Id.* Dr. Raj also found that Clark had an extreme limitation regarding his "ability to travel in unfamiliar places or use public transportation." *Id.* In support of

15

these determinations, Dr. Raj noted that Clark "does not adapt well to situations he is uncomfortable or unfamiliar with." *Id.*

Dr. Raj found that the use of alcohol as well as other substances had no impact on this assessment. *Id.* Dr. Raj further determined that Clark was able to voluntarily control his intake of alcohol as well as his use of other substances. *Id.* Lastly, Dr. Raj found that Clark was able to manage benefits in his own best interest. *Id.*

v.    Ahmed El Sokkary, Ph.D.

Ahmed El Sokkary, Ph.D., a psychologist, examined Clark in June 2013. *Id.* at 595–97. Dr. El Sokkary obtained information from Clark for his report. *Id.* at 595. Dr. El Sokkary determined that Clark "is able to care for hygiene, grooming, daily living activities, including light cooking and cleaning." *Id.* Dr. El Sokkary also noted that Clark "currently lives with his [girlfriend] and two roommates" and that he "spends the majority of time alone with his dog until his roommate comes home from work." *Id.*

Dr. El Sokkary noted that his evaluation of Clark "was limited in scope and based on a single, time-limited session." *Id.* at 596. On Axis I, Dr. El Sokkary diagnosed Clark with: (1) "Mood disorder, nos"; (2) "R/O Psychotic disorder, nos"; and (3) "R/O Cognitive disorder, nos." *Id.* Dr. El Sokkary found that, "[b]ased solely on the current evaluation and from a strictly cognitive and emotional standpoint, [Clark] demonstrates a capacity to understand, remember, and perform simple tasks." *Id.* He further found that Clark "was able to maintain a sufficient level of concentration, persistence, and pace to do basic work in an environment that [his] health condition[s] would allow." *Id.* Based on Clark's cooperation throughout the examination and Clark's ability to "adequately communicat[e]," Dr. El Sokkary determined that Clark "would be able to appropriately interact with supervisors and co-workers at this time." *Id.* Dr. El Sokkary found that Clark "would have some difficulty from time to time keeping a regular workday/workweek schedule without brief interruptions from his psychiatric symptoms." *Id.* Lastly, Dr. El Sokkary concluded that if Clark's disability application were approved, Clark would be "able to manage supplemental funds at this time." *Id.*

### vi. Xiaochuan Melody Chen, M.D.

Xiaochuan Melody Chen, M.D., also evaluated Clark in June 2013. *Id.* at 600–03. In terms of activity and daily living, Dr. Chen found that Clark "can take care of his own personal hygiene" and that he is able to "do light house duty" and "light yard work." *Id.* at 600. Dr. Chen diagnosed Clark with: (1) chronic low back pain; (2) a right hand injury stemming from his prior MRSA infection; (3) high blood pressure as reported by Clark; and (4) mental health issues, although Dr. Chen deferred from any specific psychiatric diagnoses. *Id.* at 602. In terms of a functional assessment, Dr. Chen concluded that Clark:

> can stand and walk up to six hours. [Clark] can sit without limitations. [Clark] uses a one pointed cane to ambulate, which is needed for long distance as well as uneven terrain. [Clark] can lift and carry up to 50 pounds occasionally and 25 pounds frequently. [He] is capable of climbing occasionally, balancing occasionally, stooping without limitations, kneeling without limitations, crouching occasionally, and crawling occasionally. Clark is capable of reaching, handling, fingering, and feeling without limitations at left side. [He] is capable of reaching frequently, handling frequently, fingering frequently, and feeling at the right hand. [He] cannot work around at heights. [Clark] cannot work around heavy machinery. [He] has no limitations with working around extremes of temperature. [He] has no limitations with working around chemicals. [Clark] has no limitations with working around dust, fumes, and gasses. [He] has no limitations with working around excessive noise.

*Id.* at 602–03.

### vii. Records from ValleyCare Medical Center Emergency Department: September–November 2013

In September 2013, Clark sought treatment at ValleyCare after he experienced a "sharp pain to [his] right knee . . . while lifting an engine into his car," and received pain medication and a knee immobilizer. *Id.* at 615, 619. Using crutches, Clark was able to ambulate safely when he was discharged. *Id.* at 619.

In November 2013, Clark sought treatment "after he accidentally struck his [left] leg with [a] sledgehammer" and fell the following day "while attempting to ambulate." *Id.* at 610. X-rays showed soft tissue swelling but "[n]o obvious acute fracture or subluxation." *Id.* at 612. The record indicates when Clark was discharged, he was "ambulat[ing] well on crutches" and that a "splint [had been] applied." *Id.*

17

viii.        Lesleigh Franklin, Ph.D.

Lesleigh Franklin, Ph.D., conducted a psychological evaluation of Clark in May 2015.  *Id.*
at 980–87.  Dr. Franklin began by summarizing Clark's background information.  *Id.* at 980–82.
Dr. Franklin then included her behavioral observations of Clark as well as her test results
regarding Clark's mental status.  In terms of behavioral observations, Dr. Franklin noted that Clark
"demonstrated problems paying attention and he had marked problems on formal memory
measures."  *Id.* at 982.  In describing his childhood, Clark's memory "was spotty," and Dr.
Franklin also noted that Clark "had mixed performances on formal memory measures."  *Id.*
Concerning Clark's ability to relate with others, Dr. Franklin noted that while "Clark was mostly
cooperative," he "exhibited mild irritability, egocentricity, and a lack of empathy for others."  *Id.*
With respect to his mood and affect, Dr. Franklin found that "Clark exhibited a normal range of
affect" and that Clark "endorsed depressive symptoms but his mood was euthymic."  *Id.* at 983.
Regarding Clark's thoughts and use of language, Dr. Franklin noted that "Clark spoke at a normal
rate and volume" and that Clark "was able to tell a mostly coherent story of his life, without
becoming tangential or derailed."  *Id.*  She further noted, however, that Clark "endorsed recent
auditory, visual, tactile, and olfactory hallucinations but he could not say for certain that these
things were not related to drug use."  *Id.*  Dr. Franklin found that Clark's insight and judgment
were poor.  *Id.*  She noted that Clark "denied using any pain medication, illegal substances, or
alcohol on the day of the evaluation."  *Id.*

Dr. Franklin then assessed Clark's intellectual functioning by utilizing the Weschler Adult
Intelligence Scales, Fourth Edition ("WAIS-IV").  *Id.*  According to Dr. Franklin, the WAIS-IV
"is a reliable and valid intelligence test that measures cognitive functioning."  *Id.*  Dr. Franklin
noted that Clark's WAIS-IV Full Scale IQ was 71, which "plac[ed] Clark in the 3rd percentile."
*Id.*  Dr. Franklin further noted that Clark's score "placed [Clark] in the borderline range of
intellectual functioning, but this score should be interpreted with great caution due to statistically
significant differences between indices."  *Id.* at 984.

Dr. Franklin next assessed Clark's neurocognitive functioning by utilizing the Repeatable
Battery for the Assessment of Neuropsychological Status, Form A ("RBANS") and the Trail

Making Test. *Id.* According to Dr. Franklin, the RBANS "is a reliable and valid test that measures cognitive functioning in the areas of memory." *Id.* Dr. Franklin noted that Clark scored a 67 on the RBANS Total Scale standard, which "placed him in the 1st percentile." *Id.* Dr. Franklin further noted that there were "statistically significant differences between subtests and indices" and that "this overall score should be interpreted with caution." *Id.* The Trail Making Test, according to Dr. Franklin, assesses "the executive functioning skills of planning, previewing, execution, and monitoring." *Id.* Dr. Franklin concluded that Clark's "performance . . . indicates that he has some executive functioning deficits and is likely to have trouble when engaging in work that requires his careful attention even when he is in a quiet environment which is free of distractions." *Id.* at 985.

Dr. Franklin then had Clark participate in the following tests to assess Clark's emotional functioning: (1) the Miller Forensic Assessment of Symptoms Test ("M-FAST"); (2) the Beck Depression Inventory, Second Edition ("BDI-II"); (3) the Behavior Rating Inventory of Executive Functioning—Adult Version ("BRIEF-A"). *Id.* According to Dr. Franklin, the M-FAST "is a forensic measure used to determine if a client is malingering." *Id.* Dr. Franklin found that Clark's score, namely a 6, "was higher than usual" and noted that Clark's "M-FAST performance is similar to someone who may be willing to exaggerate their symptoms for personal gain." *Id.* Dr. Franklin further noted, however, that Clark's score "is not so high that we would clearly say he is malingering, but it indicates that we must interpret his reported symptoms with caution." *Id.*

The BRIEF-A, according to Dr. Franklin, "is a self report measure which assesses behaviors associated with executive functioning problems and attention deficits." *Id.* Dr. Franklin elected to administer the BRIEF-A because of Clark's "school, employment, and legal history and his overt presentation as someone with attention problems." *Id.* Clark scored an 82 on the BRIEF-A Behavior Rating Index, which "placed him in the 99th percentile, indicating that he has significantly more meta-cognitive indicators of an executive functioning problem [than] his age related peers." *Id.* Dr. Franklin found that Clark's "test scores, history, and behavior clearly indicate that he is an individual with a long standing Attention Deficit Hyperactivity Disorder" ("ADHD"). *Id.* Dr. Franklin elaborated that, because Clark was not treated for ADHD as a child,

19

he "developed an extremely antisocial personality." *Id.*

Concerning Clark's history of depression, Dr. Franklin noted that Clark "endorsed feelings of pessimism and anhedonia, and physical symptoms of fatigue and poor concentration." *Id.* at 986. Dr. Franklin found that "Clark's BDI-II score was in the moderately depressed range," however, she noted that his score "should be interpreted with caution." *Id.* at 986. According to Dr. Franklin, "Clark may be experiencing depressive symptoms, but his claim of being physiologically depressed is questionable" because "[h]is alcohol and cannabis use could be contributing to his fatigue and concentration problems, and his claim that he is regularly medicated was not credible." *Id.* In focusing on "[t]he issue of truth telling" in relation to Clark's reported psychotic symptoms, Dr. Franklin noted that Clark was unable "to sort out whether the symptoms or drug related or not." *Id.* Dr. Franklin ultimately concluded that Clark's psychotic symptoms were "very likely" caused by his drug use. *Id.*

Finally, turning to Clark's functional capacity, Dr. Franklin concluded that:

> If Mr. Clark were to be placed in a work situation at this time, he would likely have mild difficulties remembering and carrying out simple directions, and moderate difficulties remembering and carrying out complex directions. He could have marked problems paying careful attention and monitoring his work. He would have marked difficulties completing tasks correctly at an adequate pace. He would have extreme trouble getting along with the public and co-workers and extreme trouble with authority. Mr. Clark would likely have marked problems getting to work on time or at all. Mr. Clark would need payee if he was awarded Supplemental Security Income due to his active substance use.

*Id.* at 987.

### ix. Records from Axis Community Health: June 2015

In June 2015, Zara Rooshen, B.S., R.A.S., wrote a letter indicating that Clark had been participating in a drug and alcohol recovery program at Axis Community Health since March 2015. *Id.* at 1002. Rooshen wrote that "Clark has made progress in some areas" and that "[h]is intentions to change his life are apparent." *Id.*

### 3. Function Report Responses

Clark filled out function reports in April and October 2013. *See id.* at 264–71, 293–301.

In his April 2013 responses, Clark indicated that his conditions limit his ability to work because he experiences pain at varying degrees, hears voices, has "anger issues," does not trust people, and suffers from depression. *Id.* at 264. In terms of his daily activities, Clark reported that he watches television, "makes messes," walks and cares for his dog, and "constantly forget[s] stuff." *Id.* at 264–65. Clark indicated that he sometimes has problems with tending to his personal care, such as bathing, feeding himself, and shaving. *Id.* at 265. According to Clark, his girlfriend reminds him "to shave and not sleep in clothes." *Id.* at 266. With respect to his ability to prepare meals for himself, Clark reported that he occasionally makes peanut butter and jelly sandwiches and soup for himself and that he "use[d] to cook all the time" before his conditions began. *Id.* In terms of chores and yard work, Clark noted that he can do laundry, wash dishes, and "sometimes" mow the lawn. *Id.* He also noted, however, that he does not "feel safe outside all the time" and that he "sometimes" does not go outside "for days." *Id.* at 267. In terms of shopping and transportation, Clark reported that he "sometimes" drives and shops "a couple times a month" on the "spur of the moment." *Id.* Clark listed fishing as his only hobby or interest but indicated that he has not gone fishing "for a long time." *Id.* at 268. He also indicated that he does not engage in social activities because he does not trust people. *Id.* Clark's answers that he provided in his October 2013 function report are largely similar, but he elaborated about his daily activities. For example, he indicated that he "collect[s] cans for money." *Id.* at 294. He also reported that he is "always awake" and that he "sleep[s] very little." *Id.* Lastly, Clark reported that he was able to walk "a couple blocks" before needing to rest. *Id.* at 298.

Clark's mother, Erene Clark, also filled out a function report in October 2013. *See id.* at 302–09. She indicated that Clark's conditions affect his ability to work in that he is unable to remember things, has trouble keeping track of time, often falls asleep "if not moving," and suffers from pain in his hip, leg, knee, and hand due to his history of injuries. *Id.* at 302. In terms of Clark's daily activities, his mother indicated that he watches television and "takes his dog everyw[h]ere with him." *Id.* at 303. She further indicated that Clark's "dog is in good health" and that Clark treats his dog "like a kid." *Id.* According to Clark's mother, care for his dog is the only thing that Clark does by himself. *Id.* As a result of his illness, Clark's mother reported that Clark

21

has trouble "completing things" and that he "falls asleep at all times of the day." *Id.* She also noted that he has difficulty with his personal care and that he needs to be reminded of his appointments. *Id.* at 303–04. In terms of his meals, Clark's mother indicated that Clark eats "a lot of peanut butter or fast food if he has money" but that he "used to be a pretty good cook before all the mental things got bad." *Id.* at 304. Concerning his ability to engage in house and yard work, Clark's mother reported that Clark is able to "clean up after himself," perform "some repairs," and do some yard work. *Id.* She clarified, however, that Clark does not always complete the tasks he starts and that Clark benefits from encouragement and reminders. *Id.* Like Clark indicated, Clark's mother also reported that Clark sometimes drives, sometimes buys groceries, and has not gone fishing in a long time. *Id.* at 305–06. In terms of social activities, Clark's mother noted that Clark "has trust issues" and does not engage in much socializing, except "sometimes" by phone. *Id.* at 306. She also reported that Clark will sometimes "argue with everyone" and that, since his conditions started, he "gets angry" and "doesn't trust anyone." *Id.* at 307. Clark's mother also reported that Clark does not, "at times," get along well with supervisors because Clark "thinks [they are] out to get him." *Id.* at 308. She noted that Clark "gets upset and will complain" when he experiences a change in his routine. *Id.* Lastly, Clark's mother reported that he uses a cane for balancing and that he uses a leg brace "all the time." *Id.*

### 4.  Hearing on May 15, 2015

ALJ Welton began his examination of Clark with questions concerning his education and prior work history. *Id.* at 49. ALJ Welton asked Clark his age, and Clark testified that he was fifty years old. *Id.* ALJ Welton then asked what level of education Clark had finished, and Clark replied that he had completed high school. *Id.*

ALJ Welton also asked Clark about his responsibilities in his most recent job, namely when he worked as vehicle repossessor in 2015, and Clark replied that he "just drove a tow truck." *Id.* at 49–50. ALJ Welton questioned Clark as to why he left that job, and Clark responded that he "just couldn't remember everything" and that he got lost driving the tow truck even when other employees had written instructions down on a piece of paper for him. *Id.* ALJ Welton asked Clark whether he was fired from his job, and Clark responded in the affirmative. *Id.*

22

ALJ Welton inquired whether Clark had taken any medications on the day of the hearing, and Clark indicated that he had taken Effexor, Trazodone, Buspar, and Remeron. *Id.* at 50–51. ALJ Welton then stated: "You don't seem like you're with it today, so I was just curious what the problem was. You can actually work. But you went to work for a whole week, but you're not with me here today very well. So what's going on?" *Id.* at 51. Clark replied that he "got lost" coming to the hearing. *Id.* ALJ Welton asked whether Clark had taken too many medications that morning, and Clark responded that he had not. *Id.* ALJ Welton then asked Clark about the symptoms he experiences for which he takes his medications. *Id.* at 52. Clark responded that he takes his medications for "[d]epression, anxiety, and to keep [his] anger levels down." *Id.* ALJ Welton then asked Clark whether he had used methamphetamine within the last twenty-four hours, and Clark responded in the negative. *Id.* Clark testified that the last time he had used methamphetamine was approximately five or six days before the hearing. *Id.* Clark also denied using any other drugs or alcohol the night before or the morning of the hearing. *Id.* at 52–53.

ALJ Welton then asked Clark about his current activities, including the most recent time he collected any cans. *Id.* at 53. Clark answered that he last collected cans two days prior to the hearing, and he described his process for doing so. *Id.* Clark testified that he sits on a wagon while his dog pulls him, and he also testified that he walks "maybe 20 or 30 minutes" while he collects cans within "a couple blocks" from his home. *Id.* at 53–54. ALJ Welton asked Clark about what sort of transportation he uses, and Clark replied that he still drives, including driving to the hearing, but that he has "hardly ever" utilized public transportation because he "ha[s] issues with a lot of people on buses." *Id.* at 54. In terms of errands and housekeeping, Clark testified that he "sometimes" goes shopping for food, although his "girlfriend usually does that." *Id.* He further testified that he no longer mows the lawn where he resides. *Id.* at 54–55. ALJ Welton asked Clark whether he still performs any mechanical work, and Clark responded in the negative. *Id.* at 55. Clark explained that his tools "disappeared" while he was incarcerated and that he was not sure whether he would still be able to work on a car even if he still had his tools. *Id.* at 55–56. ALJ Welton also inquired about whether Clark experienced any "difficulties reading the manuals" when engaging in mechanical work. *Id.* at 56. Clark replied that he "ha[s] problems with

23

remembering things" and that he fails to complete projects he starts. *Id.* ALJ Welton also asked Clark about when he had most recently been fishing, and Clark responded that he last went fishing approximately two or three years prior to the hearing. *Id.* at 58.

ALJ Welton inquired whether Clark had ever "looked for a job like at Jiffy Lube or something like that." *Id.* at 56–57. Clark responded in the negative, explaining that Jiffy Lube was "too far away," and that no one would hire him because of his "bad criminal history." *Id.* at 57. ALJ Welton asked Clark how he obtained his job working as a vehicle repossessor, and Clark replied that he got hired "[t]hrough a friend." *Id.* ALJ Welton asked Clark whether he was "doing meth at the same time [he] was trying to work there," and Clark responded that he "probably" used methamphetamine but could not remember. *Id.*

ALJ Welton also asked Clark about his knee brace, explaining that he "noticed all the doctors were talking about [Clark] needing to wean off of the knee brace and things of that nature." *Id.* at 58. Clark explained that a doctor at Santa Rita Jail had prescribed his knee brace because he hurt his knee when it "twisted" and "popped out of joint." *Id.* at 59. He further explained that he received a heavier brace from Axis Community Health after he was released from Santa Rita Jail. *Id.* ALJ Welton asked whether Clark experienced any pain in his knee, and Clark replied that he experiences pain when he walks and that his knee "buckles" on him if he does not wear a brace. *Id.* at 60. ALJ Welton asked Clark whether he had ever attempted physical therapy or other exercise options for his knee, and Clark responded that he had not because he would not "stick with it." *Id.*

ALJ Welton asked Clark whether any of his conditions have worsened in the six months prior to the hearing. *Id.* Clark replied that his back had worsened and that his legs cramp when he wakes up. *Id.* at 61. ALJ Welton inquired whether Clark was experiencing "any difficulty" with either of his hands. *Id.* Clark responded that he "severed the nerves in [the] pinky area" of his right hand, making it difficult for him to use a cane. *Id.* ALJ Welton then asked which doctor he was seeing to ameliorate the condition of his right hand, and Clark replied that he did not have a primary care physician. *Id.* at 61–62. He then asked whether Clark had any "active MRSA" in his hand, and Clark responded in the negative. *Id.* at 62.

Clark's attorney, Kyle Kitson, then proceeded to ask Clark about his work history. *Id.* at 63–64. Clark testified that he worked as a roofer in 2004 and as a vehicle repossessor in 2015. *Id.* Kitson asked Clark whether had attempted to find other employment between those two jobs. *Id.* Clark responded that he had tried to find another job during that time but that he "just gave up." *Id.* at 64. Kitson also asked Clark whether he primarily supported himself by collecting cans, and Clark replied that he receives financial assistance from his girlfriend as well as from General Assistance. *Id.*

Kitson asked Clark about his educational and medical background. Clark testified that he completed high school while at California Youth Authority. *Id.* at 65. Kitson then asked Clark to rate the severity of his pain in his neck, lower back, and hand on a scale of one to ten, with ten being of sufficient severity to seek prompt medical attention. *Id.* at 66–67. Clark ranked the pain in his neck and his hand as being a seven out of ten. *Id.* at 67. Concerning his hands, Clark testified that the severity of his pain "depends on if [he is] moving around or not" and that his pain gets "pretty severe where [he] can't hold on to things with it." *Id.* Kitson asked Clark what he thought he could carry in his right hand, and Clark responded that he was able to carry his cane. *Id.*

ALJ Welton then asked Clark about his role and responsibilities when he worked driving a tow truck for a vehicle repossessor. *Id.* at 68. Specifically, ALJ Welton asked whether Clark had to engage in any kind of lifting. *Id.* Clark explained that he did not have to lift anything at his job because another worker would perform all of "the tie down" work. *Id.* at 68–69.

Kitson continued his questioning of Clark by asking about Clark's mental conditions and his insomnia. *Id.* at 69. Clark stated that he normally slept approximately three hours per night and that his energy levels are usually low. *Id.* Kitson and ALJ Welton then asked Clark about his periods of sobriety, and Clark responded that he had been sober for a couple of years after he had worked as a roofer. *Id.* at 69–70. Clark did not recall the exact dates of his sobriety or when he relapsed. *Id.* Kitson asked whether Clark could remember whether he was still experiencing psychiatric symptoms while he abstained from drugs, and Clark testified that he thought he experienced "a few" during that time. *Id.* at 71. ALJ Welton and Kitson then briefly discussed the

medical reports in the record pertaining to this time period, with Kitson explaining that the record indicated Clark had a period of sobriety of approximately seven or eight years in duration. *Id.* at 72–73.

Kitson then asked Clark about his problems socially interacting with others. *Id.* at 74–75. Specifically, Kitson asked Clark whether he was placed in "the housing unit for individuals with mental health issues" while incarcerated, and Clark responded that he had been placed in that unit during his two most recent periods of incarceration. *Id.* at 75. Kitson also asked whether Clark got into fights in prison as well as while he was living at home, and Clark replied that he used to get into fights. *Id.* at 75–76. Kitson questioned Clark about whether his hesitation to take public transportation was "just an issue of being around people in general," and Clark explained that he becomes paranoid and does not trust anyone. *Id.* at 76. Turning to Clark's employment history, Kitson asked Clark whether he had ever been fired "because of issues with either a supervisor or co-workers," and Clark responded in the affirmative. *Id.* at 76. Clark testified that he "slamm[ed] a supervisor through a door" when he was working as a janitor. *Id.* at 77. He also testified that he had been fired because he "couldn't go to work" because he "had to isolate and stay away from people." *Id.*

Kitson next asked Clark whether he had problems remembering things as well as completing projects that he has started. *Id.* at 78–79. Clark answered that he has trouble remembering basic information and appointments. *Id.* at 78. He also added that he was "trying to do this program [at Axis Community Health] and trying to get on the right road and hopefully get all the doctors going and get the right medications going." *Id.* at 79.

ALJ Welton then asked VE Cottle whether there was "anything further [he] need[ed] to hear from [Clark] about his past work before [VE Cottle] testif[ied] to it." *Id.* at 80. VE Cottle asked Clark about his responsibilities as a roofer, and Clark replied that he "used to do the shingles" and "used to do the gutters." *Id.* After discussing the record and Clark's past employment with ALJ Welton, VE Cottle and ALJ Welton found that Clark's past relevant employment included his work as a roofer and a tow truck driver. *Id.* at 81–82. ALJ Welton asked VE Cottle to assume the following hypothetical:

26

> Assume a hypothetical person with the same age and education as [Clark] that is 47 years of age with a high school education. Further assume that this hypothetical person retains the capacity to occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds; can stand and walk with normal breaks for six hours out of any eight-hour workday; can sit for six hours out of an eight-hour workday; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but can do no climbing of ladders, ropes, and scaffolds. And with the right major hand the person would be capable of frequently handling, fingering, and feeling.
>
> From a non-exertional standpoint work would be limited to simple, unskilled work in a low stress work environment with only occasional decision-making, only occasional judgment required and no fast paced production with no interaction with the public and no tandem tasks with co-workers.

*Id.* at 83. ALJ Welton asked VE Cottle whether, considering the above hypothetical, the hypothetical person would be able to perform any of the work that Clark had done in the past. *Id.* at 83–84. VE Cottle answered in the negative. *Id.* at 84. ALJ Welton then asked VE Cottle whether there were any other jobs that the hypothetical individual could perform, and VE Cottle replied that the hypothetical person could work as a: (1) hand packager inspector, with 471,700 jobs nationally and 47,300 jobs in California; (2) garment sorter, with 206,600 jobs nationally and 17,000 jobs in California; and (3) bagger, with 672,000 jobs nationally and 93,000 jobs in California. *Id.* ALJ Welton then asked VE Cottle whether his opinions were consistent with the Dictionary of Occupational Titles, and VE responded in the affirmative. *Id.* ALJ Welton further asked VE Cottle whether these jobs would still be available if the hypothetical person "missed work two days or less per month," and VE Cottle replied that they would still be available if the person missed less than two days per month. *Id.* VE Cottle further testified that he "use[d] two days a month on a consistent basis as a cutoff" and that the aforementioned jobs would not be available if the hypothetical person missed more than two days per month. *Id.* at 84–85.

ALJ Welton then asked Clark about when he worked for a week in 2015 as tow truck driver for a vehicle repossessor. *Id.* at 85. ALJ Welton asked Clark whether he was "able to do the physical work during those five days or one week that [he] worked there," particularly whether he was able to drive the truck, pick up cars, and take them to the shop. *Id.* Clark responded that he "sometimes . . . didn't put them at the right place." *Id.* ALJ Welton asked whether he was able

27

to complete his tasks "from a physical standpoint" but was hindered due to his mental problems, and Clark agreed with that characterization. *Id.* at 86.

Kitson asked VE Cottle whether all of the jobs mentioned "require good use of the dominant hand." *Id.* VE Cottle responded that the jobs, namely, hand packager inspector, garment sorter, and bagger, all require "frequent use" of the dominant hand. *Id.* Kitson then aked VE Cottle whether any of the jobs require "fine hand movements" or "close work," and VE Cottle responded in the negative. *Id.* at 86–87. Kitson then asked VE Cottle whether there were any jobs available for a hypothetical individual with the following limitations: "someone who is unable to consistently, which is meaning they can do it sometimes, not consistently, maintain attention and concentration for extended periods, perform activities within a schedule, and accept instructions and respond appropriately to criticism from supervisors." *Id.* at 87. Kitson then clarified that the hypothetical person would, five to ten percent of the time in an eight-hour work day, experience difficulty: (1) "accepting criticism and supervision"; (2) "maintaining attention and concentration for extended periods"; and (3) "performing activities within a schedule." *Id.* at 88. VE Cottle replied that the jobs he had already mentioned would fit within Kitson's hypothetical. *Id.* at 89. Kitson then increased the percentage to twenty-five percent of the time, and VE Cottle testified that there would be no jobs that the hypothetical person could do. *Id.* Kitson then asked whether there would be "any jobs with someone with an extremely limited ability to accept instructions and respond appropriately to just the issue of supervision," with "extemely limited" meaning that the hypothetical individual would get into "arguments with supervisors" and engage in some sort of confrontation with his or her supervisors. *Id.* at 90. VE Cottle responded that confrontations with supervisors are "not acceptable in the workplace." *Id.*

### C. Legal Background for Determination of Disability

#### 1. Five-Step Analysis

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C.

§ 432(a)(1). A claimant is only found disabled if his physical or mental impairments are of such severity that he is not only unable to do his previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a "five-step sequential evaluation process" to determine if a claimant is disabled. 20 C.F.R.§ 404.1520(a)(4). "The claimant bears the burden of proving steps one through four, consistent with the general rule that '[a]t all times, the burden is on the claimant to establish [his] entitlement to disability insurance benefits.'" *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (quoting *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998)). At Step One, the ALJ must determine if the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If so, the ALJ determines that the claimant is not disabled and the evaluation process stops. If the claimant is not engaged in substantial gainful activity, then the ALJ proceeds to Step Two.

At Step Two, the ALJ must determine if the claimant has a "severe" medically determinable impairment. An impairment is "severe" when it "significantly limits [a person's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a "severe" impairment, then the ALJ will find that the claimant is not disabled. If the claimant does have a severe impairment, the ALJ proceeds to Step Three.

At Step Three, the ALJ compares the claimant's impairment with a listing of severe impairments (the "listing"). *See* Appendix 1, Subpart 1 of 20 C.F.R. Part 404. If the claimant's impairment is included in the listing, then the claimant is disabled. The ALJ will also find a claimant disabled if the claimant's impairment or combination of impairments equals the severity of a listed impairment. If a claimant's impairment does not equal a listed impairment, then the ALJ proceeds to Step Four.

At Step Four, the ALJ must assess the claimant's Residual Function Capacity ("RFC"). An RFC is "the most [a claimant] can still do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's] case record." 20 C.F.R. § 404.1545(a)(1). The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform his past

relevant work. 20 C.F.R. § 404.1520(a)(4). Past relevant work is "work that [a claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." 20 C.F.R. § 404.1560(b)(1). If the claimant is able to perform his past relevant work, then the ALJ finds that he is not disabled. If the claimant is unable to perform his past relevant work, then the ALJ proceeds to Step Five.

At Step Five, the burden shifts from the claimant to the Commissioner. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1223 (9th Cir. 2009). The Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite his identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)). If the Commissioner is able to identify such work, then the claimant is not disabled. If the Commissioner is unable to do so, then the claimant is disabled. 20 C.F.R. § 404.1520(g)(1).

### 2. Supplemental Regulations for Determining Mental Disability

Where there is evidence of a mental impairment that allegedly prevents a claimant from working, the Social Security Administration has supplemented the five-step sequential evaluation process with additional regulations to assist the ALJ in determining the severity of the mental impairment, establishing a "special technique at each level in the administrative review process." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). First, the Commissioner evaluates the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable impairment." 20 C.F.R. §§ 404.1520a(b)(1). For each of the eleven categories contained in the adult mental disorder listing, these are described in Paragraph A. 20 C.F.R. pt. 404, Subpt. P., App. 1, § 12.00.

If the claimant has a "medically determinable mental impairment," the Commissioner goes on to rate the degree of the claimant's functional limitation in the four "broad functional areas" identified in "paragraph B" and "paragraph C" of the adult mental disorders listings. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); Social Security Ruling 96-8p, 1996 WL 374194, at *4. Those four functional areas are the capacities to "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20

C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). Limitations are rated on a "five point scale: None, mild, moderate, marked, and extreme." 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). Based on these limitations, the Commissioner determines whether the claimant has a severe mental impairment and whether it meets or equals a listed impairment. *See* 20 C.F.R. §§ 404.1520a(d)(1)–(2), 416.920(d)(1)–(2). This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above. Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.").

If the Commissioner determines that the claimant has one or more severe mental impairments that neither meet nor are equal to any listing, the Commissioner must assess the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3). This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments. . . . " Social Security Ruling 96-8p, 1996 WL 374184, at *4.

### D. ALJ Welton's Decision

#### 1. Step One: Substantial Gainful Activity

At Step One, ALJ Welton found that Clark "has not engaged in substantial gainful activity since September 30, 2012, the application date." AR 21.

#### 2. Step Two: Severe Impairments

At Step Two, ALJ Welton determined that Clark "has the following severe impairments: degenerative disc disease of the lumbar spine, right hand pain, obesity, depression, anxiety and a polysubstance use disorder." *Id.* ALJ Welton found that "the findings reported in [Clark's] medical records indicate the above impairments have more than minimal effect on his ability to work" and are therefore "severe." *Id.* at 22.

#### 3. Step Three: Medical Severity

At Step Three, ALJ Welton found that Clark "does not have an impairment or combination

of impairments that meets or medically equals the severity of one of the listed impairments." *Id.*
ALJ Welton first concluded that Clark's impairments did not satisfy listing requirements for a major dysfunction of a joint because Clark's "medical records do not describe gross anatomical deformity with limitation of motion or other abnormal motion in one major peripheral joint in each upper extremity resulting in an inability to perform fine and gross movements effectively." *Id.*
Next, ALJ Welton found that Clark's conditions failed to equal or meet the listing requirements for a spinal disorder because "the record does not describe the evidence of a nerve root compression characterized by pain, limitation of motion in the spine, motor loss and sensory or reflex loss." *Id.* ALJ Welton then noted that while obesity is not a listed impairment, "it is a medically determinable impairment whose cumulative effects must be considered at Step 3 of the sequential evaluation process." *Id.* ALJ Welton found that "the objective medical evidence in this case does not suggest that the cumulative effects of [Clark's] obesity meet the criteria set forth in any section of the Listings." *Id.*

Concerning Clark's psychiatric symptoms, ALJ Welton determined that Clark "suffers from no mental impairment or combination of mental impairments which meet or medically equal the criteria for any Listing level mental impairment." *Id.* In support of this conclusion, ALJ Welton noted that Clark did not have at least two marked restrictions in the following areas in accordance with "paragraph B" for both listings 12.04 and 12.06: (1) activities of daily living; (2) maintaining social functioning; (3) maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation that are extended in their duration. *Id.* Concerning Clark's activities of daily living, ALJ Welton found that Clark has only a "mild restriction" because Clark is able to engage in activities such as light cooking, tending to his laundry, taking care of his dog, washing his dishes, shopping, collecting cans, and mowing his lawn. *Id.* With respect to social functioning, ALJ Welton determined that Clark has a moderate restriction because Clark "does not trust other people and has no friends but also reported that he lives with his girlfriend and a friend in a mobile home and visits with his mother." *Id.* Concerning Clark's concentration, persistence, or pace, ALJ Welton concluded that Clark has a moderate restriction, noting that his conclusion was "consistent with the results of Dr. El-Sokkary's June 2013

psychological evaluation." *Id.* at 23. Regarding episodes of decompensation, ALJ Welton found

that Clark "has experienced no episodes of decompensation" of "extended duration." *Id.* ALJ

Welton concluded that, "[b]ecause [Clark's] mental impairments do not cause at least two

'marked' limitations or one 'marked limitation' and 'repeated' episodes of decompensation, the

'paragraph B' criteria are not satisfied." *Id.* Lastly, ALJ Welton also found that the evidence

concerning Clark's impairments "fails to establish the presence of the 'paragraph C' criteria" and

therefore concluded that Clark had not met or equaled the listing requirements for an affective

disorder, an anxiety disorder, or a substance abuse disorder. *Id.*

### 4. Step Four: Residual Functional Capacity

ALJ Welton found that Clark has the residual functional capacity to perform light work as

defined in 20 C.F.R. § 416.967(b) with the following exceptions:

> [L]ifting/carrying of 10 pounds frequently and 20 pounds
> occasionally, sitting for 6 hours in an 8 hour day, standing/walking
> for 6 hours in an 8 hour day, occasional stooping, balancing,
> crouching, crawling, kneeling and climbing of ramps and stairs,
> frequent handling, fingering, and feeling with the right hand, and no
> climbing of ladders, ropes, or scaffolds, and with a limitation to
> work involving simple repetitive tasks performed in a low stress
> environment, requiring only occasional decision-making, occasional
> changes in the work setting, and the occasional need to exercise
> judgment, and with a preclusion against work involving fast-paced
> production tasks, involving interaction with the public and involving
> tandem tasks performed with coworkers.

*Id.* In reaching this determination, ALJ Welton first discussed Clark's medical records concerning

his physical impairments, including his joint and low back pain, his chronic hip pain, his use of a

cane, and his treatment for a MRSA infection. *Id.* ALJ Welton noted that Clark had reported to

prison physicians that he experienced low back pain as a result of falling off a roof. He further

noted that "an x-ray of [Clark's] lumbar spine showed a probable old moderate compression

fracture at T-8 but was otherwise unremarkable." *Id.* He also noted that Clark has periodically

walked with a cane and that Clark had reported chronic hip, back, and thigh pain. *Id.* at 23–24.

ALJ Welton then turned to the consultative orthopedic evaluation by Dr. Bai in March

2011. *Id.* at 24. ALJ Welton noted that, during his visit with Dr. Bai, Clark "reported that he was

experiencing low back, right hip, hand, neck, knee and right foot pain as well as bilateral leg

numbness." *Id.* ALJ Welton noted that Dr. Bai found that Clark "ambulated with a cane in the right hand, had an antalgic gait, and was unable to do to heel and toe walking but that he was able to ambulate without a cane in the examining room." *Id.* ALJ Welton noted that Dr. Bai found that Clark "could lift 10 pounds frequently and 20 pounds occasionally, sit for 6 hours in an 8 hour day, stand/walk for 6 hours in an 8 hour day, and perform occasional climbing, stooping, kneeling, and crouching." *Id.* ALJ Welton noted that Dr. Bai determined Clark "would need to change positions for 10–15 minutes after every 2 hours of standing/walking and should be allowed to use a cane for less than 2 hours in an 8 hour day to assist in ambulation, for longer distance ambulation and when walking on uneven surfaces." *Id.* ALJ Welton gave "[g]reat deference" to Dr. Bai's findings "to the extent that they are consistent with the above residual functional capacity finding." *Id.* at 28. ALJ Welton added, however, that he attributed "no weight" to Dr. Bai's conclusion that Clark needed to use a cane, reasoning that "there is no evidence that any physician has recommended that [Clark] use a cane, other than for a limited period of time." *Id.*

ALJ Welton also supported his residual functional capacity determination of Clark by discussing Dr. Chen's June 2013 consultative examination. *Id.* at 24. According to ALJ Welton, Dr. Chen "observed that [Clark] was using a cane and had reported that he could not do tandem gait, hop or squat but she also observed that [Clark's] gait was steady." *Id.* Dr. Chen "concluded that the claimant could lift/carry 25 pounds frequently and 50 pounds occasionally, handling, fingering and feeling with the right hand, and could not work at heights or around heavy machinery." *Id.* ALJ Welton also gave "[g]reat deference" to Dr. Chen's findings. *Id.* at 28. He attributed "little weight," however, to Dr. Chen's findings that indicated that Clark was "less limited [than] contemplated in the residual functional capacity finding above" because "they are not consistent with Dr. Chen's own examination findings and the findings reflected in [Clark's] treatment records." *Id.*

ALJ Welton then summarized Clark's mental health medical records. *Id.* at 25–28. First, ALJ Welton discussed Dr. Raj's findings that Clark: (1) suffered from bi-polar disorder; (2) "was markedly limited in his ability to work in coordination with or proximity to others"; (3) had marked limitations concerning his ability to "complete a normal workday or workweek without

34

interruptions from psychologically-based symptoms and perform at a consistent pace"; (4) "was extremely limited to interact appropriately with the public and get along with coworkers"; and (5) "was extremely limited in his ability [to] travel in unfamiliar places or use public transportation." *Id.* at 26–27. He attributed "no weight" to Dr. Raj's findings because they "were based upon a short-term treatment relationship and the limitations Dr. Raj identified are out of proportion to the findings that he reported and that have been reported by other mental health clinicians." *Id.* at 28.

Second, ALJ Welton summarized Dr. El Sokkary's consultative psychological evaluation in which Dr. El Sokkary "diagnosed a mood disorder and concluded that [Clark] could perform simple tasks, could maintain sufficient level concentration, persistence and pace to do basic work and could interact appropriately with supervisors and coworkers but would have difficulty from time to time keeping in regular workdays/workweek schedule without interruptions from psychiatric symptoms." *Id.* at 27. ALJ Welton gave "great weight" to Dr. El Sokkary's findings, reasoning that they were "consistent with the evidence indicating stabilization of [Clark's] psychiatric symptoms with associated improved functioning when he has been incarcerated and maintained on his psychiatric treatment regimen." *Id.* at 28.

Third, ALJ Welton discussed Dr. Franklin's psychological evaluation report. *Id.* at 27. ALJ Welton noted that "Dr. Franklin reported findings of impaired memory, mild irritability, impaired insight and poor judgment during mental status examination." *Id.* ALJ Welton further noted that "Dr. Franklin interpreted [Clark's] scores as indicating cognitive deficits and attention deficit hyperactivity disorder (ADHD)." *Id.* ALJ Welton acknowledged that Dr. Franklin found Clark's score on the M-FAST to be "not so high as to clearly say that [Clark] was malingering but that they did indicate that [Clark's] reported symptoms should be interpreted with caution." *Id.* Dr. Franklin also diagnosed Clark with "ADHD, amphetamine, cannabis and alcohol use disorders and an antisocial personality disorder." *Id.* ALJ Welton attributed "no weight" to Dr. Franklin's findings because "she did not review and consider [Clark's] prison medical records and her conclusions are not consistent with [Clark's] history, including the evidence of stabilization of [Clark's] psychiatric symptoms when he has been incarcerated and consistently maintained on psychotropic medication." *Id.* at 28–29.

Fourth, ALJ Welton ascribed "great weight" to the findings of the "State Agency medical consultant who likewise found that [Clark] could perform some light work" because "that opinion is supported by the record as a whole."[6] *Id.* at 28.

After ALJ Welton concluded that he had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," he found that Clark's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Clark's] statements and those of his mother concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." *Id.* at 29–30. According to ALJ Welton, he found "specific and legitimate reasons to reject [Clark's] statements and those of his mother regarding his symptoms." *Id.* at 29.

ALJ Welton found Clark's allegations of complete disability to be "undermined by his history." *Id.* Specifically, ALJ Welton concluded that Clark's symptoms "stabilized" when he was incarcerated because he received regular treatment and abstained from drugs and alcohol. *Id.* He also determined that the credibility of Clark's allegations was undermined by his statements to the Social Security Administration and to Dr. El Sokkary that "he was able to perform a variety of daily activities including driving, doing light cooking, doing laundry, taking care of his dog, washing dishes, going shopping, cleaning and mowing the lawn." *Id.* at 29–30. ALJ Welton also noted that in Clark's mother's function report responses, she similarly "reported that [Clark] does light cooking, cleans up after himself, does some repairs, goes shopping and cares for his dog like 'a kid.'" *Id.* at 30. ALJ Welton further noted that, despite having an alleged onset disability date of December 15, 2007, Clark had reported to physicians that he sustained injuries in 2013 while he was lifting an engine into his car and while he was using a sledgehammer. *Id.*

ALJ Welton also found that there are "further inconsistencies in the record which undermine [Clark's] credibility." *Id.* In particular, ALJ Welton noted that while Clark "repeatedly told his physicians and clinicians that a cane had been prescribed for him and that he

---

[6] It is worth noting that ALJ Welton does not specify which of the various consultants whose opinions are included in the exhibit he cited deserved "great weight." AR 28.

needed to use a cane or a wheelchair, there is no evidence that any physician recommended or prescribed a cane or wheelchair other than for a short period of time." *Id.* ALJ Welton surmised that, accordingly, Clark's "use of a cane or wheelchair was merely affirmed by [Clark's] physicians after he reported he was using one or the other." *Id.* ALJ Welton found that Clark "has also made inconsistent statements regarding his drug use," as he reported that he had used methamphetamine while hospitalized in March 2010 but later reported to his prison physician in April 2010 that he had refrained from using methamphetamine for eight years. *Id.* Lastly, ALJ Welton cited Clark's M-FAST score as an indication that Clark's "credibility was questionable." *Id.* In contrast to his analysis of Clark's own statements, ALJ Welton did not identify specific statements by Clark's mother that he found not to be credible or specific reasons for rejecting her testimony.

### 5. Step Five: Ability to Perform Other Jobs in the National Economy

At Step Five, ALJ Welton found that Clark "is unable to perform any past relevant work." *Id.* He further found, however, that in "[c]onsidering [Clark's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Clark] can perform." *Id.* at 31. In support of this determination, ALJ Welton relied on VE Cottle's testimony that a person with the RFC assessed by ALJ Welton could work as a hand packager inspector, garment sorter, and bagger, with each of those jobs existing in significant numbers in the national economy. *Id.* Accordingly, ALJ Welton concluded that "[a] finding of 'not disabled' is therefore appropriate under the framework of the above-cited rules" and that Clark is not disabled pursuant to Section 1614(a)(3)(A) of the Social Security Act. *Id.* at 31–32.

### E. Motions for Summary Judgment

#### 1. Clark's Motion for Summary Judgment

Clark filed this Motion seeking review of ALJ Welton's decision and now moves for summary judgment on the basis that ALJ Welton committed five errors in his November 2015 decision. First, Clark argues that ALJ Welton improperly rejected the opinions of Drs. Raj and Franklin because he failed to provide specific and legitimate reasons for doing so. Clark's Mot. (dkt. 16) at 8–15 (citing, e.g., *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). With respect to

Dr. Raj's opinion, Clark contends that Dr. Raj's failure to adhere to Dr. El Sokkary's view that Clark's psychiatric symptoms stabilized while he was incarcerated and receiving consistent treatment does not constitute a specific and legitimate reason for rejecting Dr. Raj's opinion. *Id.* at 11. To the contrary, Clark contends that any improvement of his symptoms while incarcerated is, in fact, "indicative of disability." *Id.* at 11 (citations omitted). Second, Clark contends that ALJ Welton improperly evaluated Clark's credibility because ALJ Welton utilized the "specific and legitimate reasons" standard for rejecting his testimony when he should have employed the "clear and convincing" standard. *Id.* at 15–17 (citing *Gallant v. Heckler*, 753 F.2d 1450, 1455 (9th Cir. 1984)). Third, Clark asserts that ALJ Welton erred when he rejected Clark's mother's third party statements because he failed to provide "germane" reasons for doing so. *Id.* at 17–18 (citing *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001)). Fourth, Clark argues that ALJ Welton improperly calculated Clark's residual functional capacity because he did not consider "all of [Clark's] impairments, even those that are not severe." *Id.* at 18–20 (citing Social Security Ruling 96-8p, 1996 WL 374184, at *5). Specifically, Clark argues that ALJ Welton "failed to incorporate [Clark's] reliance on a cane for longer ambulation" as part of his residual functional capacity determination as well as Clark's inability to interact appropriately with his supervisors. *Id.* Fifth, Clark asserts that ALJ Welton improperly determined Clark's severe impairments because he failed to mention Clark's diagnoses of organic mental disorder, ADHD, and Antisocial Personality Disorder at Step Two of the five-step framework. *Id.* at 20–22.

## 2. Commissioner's Motion for Summary Judgment

The Commissioner filed a cross-motion for summary judgment, asking the Court to affirm ALJ Welton's decision that Clark is not disabled. Def.'s Mot. (dkt. 19) at 1. The Commissioner contends that Clark's assertions are without merit because ALJ Welton's decision is free of reversible error and is supported by substantial evidence. *Id.* at 18. First, the Commissioner argues that ALJ Welton did not err in evaluating the medical opinion evidence at issue in this case. *Id.* at 2–8. The Commissioner contends that ALJ Welton "properly gave the opinions of Drs. Raj and Franklin no weight because they were inconsistent with the medical records as a whole." *Id.* at 4 (citing 20 C.F.R. § 416.927(c)(4)). Second, the Commissioner contends that ALJ Welton

properly evaluated Clark's credibility in terms of Clark's "subjective account of his symptoms" because: (1) Clark's claims were contradicted by medical evidence; (2) ALJ Welton "properly considered [Clark's] noncompliance with treatment"; (3) Clark's reported daily activities were "inconsistent with his reports of disability"; and (4) Clark made inconsistent statements concerning his drug use. *Id.* at 9–13. Third, the Commissioner asserts that ALJ Welton properly discounted Clark's mother's answers that she provided on a function report because the reasons ALJ Welton provided in rejecting Clark's testimony were also germane reasons for rejecting his mother's testimony. *Id.* at 13 (citing *Valentine v. Astrue*, 574 F.3d 685, 694 (9th Cir. 2009)). Fourth, the Commissioner argues that ALJ Welton's residual functional capacity determination was supported by substantial evidence. *Id.* at 13–15. The Commissioner contends that ALJ Welton properly excluded "any use of a cane or walker" from the residual functional capacity determination because evidence in the record was "inconsistent" with Clark's use of a cane. *Id.* at 14. With respect to Clark's inability to interact appropriately with supervisors, the Commissioner asserts that "limitations to simple work account for moderate limitations caused by mental impairments," including an inability to respond to criticism. *Id.* at 14–15 (citing, e.g., *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174–76 (9th Cir. 2008)).

Finally, the Commissioner contends that even if ALJ Welton committed an error at Step Two or Step Three, the error is harmless. *Id.* at 16–18. According to the Commissioner, any failure to mention "psychotic or mood disorder related to [Clark's] methamphetamine use, ADHD, and antisocial personality disorder" as severe impairments at Step Two are harmless because ALJ Welton went on to discuss them in his residual functional capacity analysis. *Id.* at 16 (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)). At Step Three, the Commissioner contends any error made by ALJ Welton is harmless because Clark failed to meet his burden of showing that he met the requirements for listings 12.02 and 12.08. *Id.* at 18.

### 3. Clark's Reply

In his Reply, Clark reiterates many of the same arguments he presented in his motion for summary judgment. Clark elaborates, however, on his argument that ALJ Welton lacked specific and legitimate reasons for rejecting the opinions of Drs. Raj and Franklin, comparing those

39

doctors' opinions to the opinion of Dr. El Sokkary as well as the opinion of the state agency medical consultant that ALJ mentioned, although not by name, in his November 2015 opinion. Pl.'s Reply (dkt. 22) at 8–9. With respect to Dr. El Sokkary's opinion, Clark argues that "Dr. El Sokkary only administered a mental status examination, a brief test originally designed to test for dementia among elderly populations" and, accordingly, his "examining source opinion should have been accorded little weight." *Id.* at 9. Concerning the opinion of the state agency medical examiner, Clark points out that ALJ Welton "did not even specify which medical consultant he was giving great weight to, as he simply alluded to 'a medical consultant' and cited Exhibit 3A, which contains the opinions of multiple physical and psychological consultants." *Id.* at 8. Moreover, Clark contends that "the opinion of a non-examining doctor does not alone constitute substantial evidence for rejecting the opinion of a treating or examining doctor." *Id.* (citing *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995)).

### III.   ANALYSIS

#### A.   Legal Standard Under 42 U.S.C. §§ 405(g) and 1383(c)(3)

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be based on the record as a whole. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's

conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison v. Colvin*, 759 F.3d 995, 1019–21 (9th Cir. 2014).

### B.  Any Error in Determining Clark's Severe Impairments Was Harmless

The Ninth Circuit applies a harmless error analysis to social security appeals. *McLeod v. Astrue*, 640 F.3d 881, 887 (9th Cir. 2011); *Molina*, 674 F.3d at 1115 ("We have long recognized that harmless error principles apply in the Social Security Act context." (citation omitted)); *see also Marsh*, 792 F.3d at 1172 ("[W]e apply harmless error analysis to social security cases."). The application of the harmless error analysis is "fact-intensive," as "no presumptions operate," and courts "must analyze harmlessness in light of the circumstances of the case." *Marsh*, 792 F.3d at 1172 (quoting *Molina*, 674 F.3d at 1121). "ALJ errors in social security cases are harmless if they are 'inconsequential to the ultimate nondisability determination' and . . . 'a reviewing court cannot consider [an] error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Id.* at 1173 (quoting *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). In *McLeod v. Astrue*, the Ninth Circuit held that "remand is appropriate" when "the circumstances of the case show a substantial likelihood of prejudice." 640 F.3d at 888. Alternatively, the court explained that "where harmlessness is clear and not a borderline question, remand for reconsideration is not appropriate." *Id.* (internal quotation marks omitted). Furthermore, the court also found that, "despite the burden to show prejudice being on the party claiming error by the administrative agency, the reviewing court can determine from the 'circumstances of the case' that further administrative review is needed to determine whether there was prejudice from the error." *Id.* (citing *Shinseki v. Sanders*, 556 U.S. 396, 410–11 (2009)). Lastly, courts "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001) (citing *SEC v. Chenery Corp*, 332 U.S. 194, 196 (1947)).

41

Clark argues that ALJ Welton erred because he "did not include organic mental disorder, Attention Deficit Disorder, and Antisocial Personality Disorder in his step two analysis." Pl.'s Mot. at 21. It is worth noting that none of the exhibits Clark cites in support of his argument mention organic mental disorder. There are, however, numerous instances in the record where Clark has been diagnosed with a mood disorder. *See*, e.g, AR 720, 723, 725, 727, 785. Dr. Franklin also diagnosed Clark with Attention Deficit Disorder and Antisocial Personality Disorder. *Id.* at 987.

The Ninth Circuit has held that an ALJ's failure to consider a severe impairment at Step Two can amount to a harmless error when the ALJ subsequently discusses the limitations posed by that impairment at Step Four. *See Lewis*, 498 F.3d at 910–911 (holding that the ALJ's failure to list plaintiff's bursitis at Step Two constituted a harmless error because the ALJ's decision "reflect[ed] that the ALJ considered any limitations posed by the [plaintiff's] bursitis at Step 4"). The Commissioner concedes that ALJ Welton "did not find psychotic or mood disorder related to his methamphetamine use, ADHD, and antisocial personality disorder to be severe impairments" at Step Two. Def.'s Mot. at 16. The Commissioner contends, however, that ALJ Welton "cur[ed] any error" because he later discussed these impairments at Step Four. *Id.* at 16–17. The Court agrees. At Step Four, ALJ Welton discussed Dr. Franklin's diagnoses of Clark having ADHD and Antisocial Personality Disorder. AR 27. He also discussed Dr. El Sokkary's diagnosis of Clark having a mood disorder. *Id.*. Accordingly, even if ALJ Welton should have determined that Clark's mood disorder, Attention Deficit Disorder, and Antisocial Personality Disorder were severe, any error was harmless because ALJ Welton considered these limitations in his explanation of his residual functional capacity determination. *Lewis*, 498 F.3d at 911; *see also Bryant v. Colvin*, No. 15-cv-02982 (JSC), 2016 WL 3405442, at *25 (N.D. Cal. June 21, 2016).

**C.   ALJ Welton Erred in Determining that Clark's Impairments Met No Listing**

At Step 3, ALJ Welton considered the following listings: 1.02 (Major Dysfunction of a Joint(s) (Due to Any Cause)); 1.04 (Disorders of the Spine); 12.04 (Affective Disorders); 12.06 (Anxiety Related Disorders); 12.09 (Substance Addiction Disorders). AR 22–23. As discussed above, ALJ Welton concluded that Clark's impairments did not meet or equal the 'paragraph B'

requirements for listings 12.04 and 12.06. AR 22. He also determined that Clark's impairments did not meet or equal the 'paragraph C' requirements for listings 12.04, 12.06, and "by reference," 12.09. *Id.* at 23.

Listing 12.04 pertains to affective disorders, with "paragraph A" criteria requiring "[m]edically documented persistence" of: (1) "[d]epressive syndrome'; (2) "[m]anic syndrome"; or (3) "[b]ipolar syndrome." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04.[7] The applicable "paragraph B" criteria require that the claimant's affective disorder "[r]esult[] in at least two of the following": (1) "[m]arked restriction of activities of daily living"; (2) "[m]arked difficulties in maintaining social functioning"; (3) "[m]arked difficulties in maintaining concentration, persistence, or pace"; or (4) "[r]epeated episodes of decompensation, each of extended duration." *Id.* The "paragraph C" criteria for listing 12.04 require that the claimant have a "[m]edically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following": (1) "[r]epeated episodes of decompensation, each of extended duration"; (2) a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate"; or (3) "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." *Id.*

Listing 12.06 pertains to anxiety-related disorders, with the "paragraph A" criteria requiring that the claimant have "[m]edically documented findings of at least one of the following": (1) [g]eneralized persistent anxiety accompanied" by certain listed symptoms; (2) "[a] persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation"; or (3) "[r]ecurrent severe panic attacks

---

[7] The listings for mental impairments have been amended since the date of ALJ Welton's decision. The parties' briefs, all filed several months after the listings were amended, do not address the changes to the listings or whether such intervening amendments should affect the Court's analysis. The Court therefore applies the listing definitions in effect at the time of the decision under review, and all citations herein to specific listings refer to their then-existing versions.

manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.06. The "paragraph B" criteria for listing 12.06 are the same as the 'paragraph B' listing criteria for listing 12.04. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04, 12.06. The 'paragraph C' criteria for listing 12.06 require the anxiety-related disorder to cause the claimant to suffer from a "complete inability to function independently outside the area of [the claimant's] home. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.06.

In reaching his conclusion that Clark did not meet the "paragraph B" criteria, ALJ Welton rejected the opinions of Drs. Raj and Franklin. "Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830. "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted). "[T]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Id* at 1202 (quoting *Lester*, 81 F.3d at 831). The Ninth Circuit has recently emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a contradictory medical opinion:

> "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough

summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick* [*v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)]. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it very little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion. *See id.*

*Garrison*, 759 F.3d at 1012–13.

### 1. Dr. Raj's Opinion

ALJ Welton attributed "no weight" to Dr. Raj's findings concerning Clark's "ability to meet the mental demands of work" based on the brevity of his "treatment relationship" with Clark as well as due to the fact that "the limitations he identified are out of proportion to the findings that he reported and that have been reported by other mental health clinicians." AR 28. He attributed "great weight" to examining physician Dr. El Sokkary's conflicting findings, reasoning that Dr. El Sokkary's "conclusions are consistent with the evidence indicating stabilization of [Clark's] psychiatric symptoms with associated improved functioning when he has been incarcerated and maintained on his psychiatric treatment regimen." *Id.* Even though ALJ Welton himself referred to the relationship between Clark and Dr. Raj as a "treatment relationship," the Commissioner contends that Dr. Raj was not, in fact, Clark's treating physician. Def.'s Mot. at 6. The applicable regulation defines who constitutes a "treating source" as follows:

Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical conditions(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical

45

source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

20 C.F.R. § 416.927(a)(2). In *Benton v. Barnhart*, the Ninth Circuit elaborated on who can be considered a "treating source" as a matter of first impression. 331 F.3d 1030, 1035–39 (9th Cir. 2003). The court quoted with approval a district court's conclusion that:

It is not necessary, or even practical, to draw a bright line distinguishing a treating physician from a non-treating physician. Rather, the relationship is better viewed as a series of points on a continuum reflecting the duration of the treatment relationship and the frequency and nature of the contact. For instance, the opinion of a doctor who has examined the patient will ordinarily be entitled to greater weight than the opinion of a non-examining physician whose only knowledge of the patient is obtained from written reports. 20 C.F.R. § 404.1527(d)(1). Similarly, the opinion of a physician who has treated the patient for an extended period of time is usually entitled to greater weight than a physician who has only examined the patient for [Social Security Administration] purposes, because the treating physician is employed to cure, and also has a greater opportunity to know and observe the patient over the course of time. *Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989). *See also* 20 C.F.R. § 404.1527(d)(2).

*Id.* at 1038 (quoting *Ratto v. Sec'y, Dep't of Health & Human Servs.*, 839 F. Supp. 1415, 1425 (D. Or. 1993)). The court concluded that the plaintiff's psychiatrist, who had performed a mental capacity assessment, was a treating physician because he had sufficient contact with the plaintiff "as the leader of a treatment team that had an extensive ongoing treating relationship with [the plaintiff]." *Id.* at 1035–39. The court reasoned that the psychiatrist had "had examined [the plaintiff] not much more than a year before his report, and was still employed to cure her." *Id.* at 1038. The court further reasoned that the psychiatrist's mental capacity assessment reflected his own knowledge as well as the knowledge the treatment team working under his supervision. *Id.* at 1039. Following the reasoning in *Benton*, the Ninth Circuit held in *Le v. Astrue* that a physician who saw the plaintiff "only five times in three years for treatment of severe psychological problems" was the plaintiff's treating physician. 529 F.3d 1200, 1201–02 (9th Cir. 2008).

Turning to the record at issue in this case, Clark visited Axis Community Health, where Dr. Raj was a practitioner, on numerous occasions in 2012 and 2013. *See* AR 579–94, 989–1002.

46

In March 2012, Clark met with Stephanie Kelly, a case manager, in attempt to acquire refills of his psychiatric medications. *Id.* at 594. Kelly scheduled an appointment for Clark to see a physician the following week. *Id.* During that appointment she had arranged, Clark visited Axis Community Health and requested refills of his psychiatric medication to keep him in compliance until he was able to see a psychiatrist, as he had recently been released from prison. *Id.* at 592. Dr. Raj's name and signature appear to be on the paperwork for that visit. *Id.* In October 2012, Clark went to Axis Community Health for ruptured sutures in his hand following his surgery for MRSA, and Andrea Williams signed the office visit paperwork. *Id.* at 582–583. In April 2013, Edward Liu saw Clark, although Dr. Raj's name is listed as Clark's primary care provider. *Id.* at 584. During this visit, Clark complained of back pain and presented the physician with disability paperwork. *Id.* A few days later, Dr. Raj filled out a mental capacity assessment form for Clark's disability paperwork and also saw Clark for an office visit. *Id.* at 589–591. In December 2013, Clark visited Axis Community Health for a follow up after he sustained injuries to his lower left leg when he accidentally struck it with a sledgehammer. *Id.* at 989. Andrea Williams is listed as his current provider, and Sudha Chadalawada, M.D., is listed as his primary care provider. *Id.* At the visit, Clark also requested refills for his psychiatric medications until his upcoming appointment the following month. *Id.* In March 2015, Clark began participating in a drug and alcohol recovery program at Axis Community Health. *Id.* at 1002.

While Dr. Raj himself did not see Clark all that frequently, Clark sought treatment at Axis Community Health numerous times, including visits that were not based on his need for a report in support of his claim for disability. *Id.* at 61–62 (Clark's attorney explaining that Clark visited Axis Community Health for primary health provider treatment), *id.* at 748 (progress note during a period of incarceration indicating that Clark "was getting treatment at Axis [Community Health] while out of custody"), *see also id.* at 579–94, 989–1001. Additionally, while it is unclear to what extent, if at all, Dr. Raj supervised other staff members at Axis Community Health, he nonetheless was able to review their records and observations. Dr. Raj's findings are entitled to greater weight than an examining physician who examined him merely for disability determination purposes because Dr. Raj was able to observe him on multiple occasions and was employed to cure Clark.

47

*Benton*, 331 F.3d at 1038 (citing *Rodriguez*, 876 F.2d at 761).

"Although the treating physician's opinion is given deference, the ALJ may reject the opinion of a treating physician in favor of a conflicting opinion of an examining physician if the ALJ makes 'findings setting forth specific, legitimate reasons for so doing that are based on substantial evidence in the record.'" *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). Here, the length of time that Clark saw Dr. Raj is not a specific and legitimate reason for rejecting Dr. Raj's findings in favor of those of Dr. El Sokkary. Unlike Dr. El Sokkary, who only examined Clark once for disability determination purposes, Dr. Raj saw Clark multiple times and prescribed Clark medications. AR 589–92. Along with other clinicians at Axis Community Health, he was employed to cure Clark.

The second reason that ALJ Welton set forth for rejecting Dr. Raj's findings, namely that they "are out of proportion to the findings that he reported and that have been reported by other mental health clinicians," is also not a specific and legitimate reason to discredit Dr. Raj's opinion. *Id.* at 28. The Commissioner argues that ALJ Welton properly discounted Dr. Raj's opinion because his findings "were inconsistent with the record as a whole" in that Clark's periods of improvement while he was incarcerated "show that his mental impairments were controlled with compliance." Def.'s Mot. at 4.

In *Garrison v. Colvin*, the Ninth Circuit cautioned against characterizing improved periods of mental health as indicating that a claimant is not disabled:

> Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for the ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding that a claimant is capable of working. Reports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and nature of her symptoms. They must also be interpreted with an awareness that improved functioning while being treated and while limited environmental stressors does not always mean that a claimant can function effectively in a workplace.

759 F.3d at 1017 (citations omitted). Intermittent improvement in limited to structured settings is particularly suspect as evidence that a claimant can work outside of such settings. *See* 20 C.F.R.

Pt. 404, Subpt. P, App. 1, 12.00(F).

To the extent that Clark's symptoms improved during periods of incarceration, such improvement is attributable to the consistent medical treatment that Clark received while incarcerated as well as any other benefits associated with Clark remaining in a highly structured setting. The Commissioner argues that the effective listings at issue in this case do not include prison as an example of a highly structured setting. Def's Mot. at 7. The listing states:

> Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychological factors such as placement in a *hospital, halfway house, board care and facility, or other environment that provides similar structure*. Highly structured and supportive settings may also be found in your home. Such settings may greatly reduce the mental demands placed on you. With lowered mental demands, overt symptoms and signs of the underlying mental disorder may be minimized. At the same time, however, your ability to function outside of such a structured or supportive setting may not have changed. If your symptomatology is controlled or attenuated by psychosocial factors, we must consider your ability to function outside of such highly structured settings.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(F) (emphasis added). District courts have found that prisons, while not explicitly mentioned in the listing, can constitute highly structured settings that may minimize a claimant's psychological symptoms. *See Morris v. Astrue*, No. 11-cv-248 (JL), 2012 WL 4499348, at *11 (D.N.H. Sept. 28, 2012) ("The court has no doubt that a prison environment can provide the type of highly structured setting described in the listings."); *Clester v. Comm'r of Soc. Sec.*, No. 09-cv-765 (ST), 2010 WL 3463090, at *7 (D. Or. Aug. 3, 2010) ("[I]mprisonment also imposes a highly structured setting with little interaction with a limited set of individuals, a highly controlled schedule, and incentives for 'good' behavior. It imposes little or nothing comparable to the performance demands that are imposed in daily life, much less in a competitive work setting."), *findings and recommendation adopted*, 2010 WL 3463078 (D. Or. Aug. 31, 2010); *Langwell v. Comm'r of Soc. Sec. Admin.*, No. 3:14-cv-00019 (ST), 2015 WL 3936449, at *6 (D. Or. June 4, 2015) ("[P]rison provides a regimented lifestyle and rewards for good behavior that are unique to incarceration . . . it is precisely the type of highly controlled environment the [Social Security Administration] requires the ALJ to contemplate before a finding

49

that a claimant's behavior is improved or her symptoms have diminished." (report and recommendation adopted June 26, 2015)); *Moore v. Colvin*, No. 5:12-CV-120 (C), 2013 WL 3156505, at *5 (N.D. Tex. May 21, 2013) ("Finally, the evidence shows that Moore remained in highly supportive living arrangements such as jail, psychiatric facilities, and his family ranch where he lived with his mother throughout the relevant period." (report and recommendation adopted June 21, 2013)).

Clark's periods of incarceration were the most highly structured and supportive periods of his life reflected in the record. They were the only periods of time in which he received consistent medical treatment as an adult. *See* AR 382, 516, 561, 600, 981–82. The record reflects that lack of access to medical care and his prescriptions has in fact been a source of stress for Clark. Dr. Graves-Matthews noted that Clark did not receive follow up medical attention after being released because he did not have medical insurance. *Id.* at 382. Dr. Chaffin reported that Clark appeared nervous about how he would be able to obtain medication following his release from prison. *Id.* at 756. She further noted that she "calmed him" down by explaining how he would able to acquire medication. *Id.* Accordingly, to the extent that Clark's symptoms improved while he was incarcerated, it is not is not a specific and legitimate reason to reject Dr. Raj's conclusions for those of Dr. El Sokkary. *Id.* at 28. Under listing 12.00(F), ALJ Welton should have considered the fact that Clark's symptoms may have been minimized during periods of incarceration because he was living in a highly structured environment.

### 2. Dr. Franklin's Opinion

ALJ Welton also gave "no weight" to Dr. Franklin's conclusions because "she did not review and consider [Clark's] prison medical records" and because "her conclusions are not consistent with [Clark's] history, including the evidence of stabilization of [Clark's] psychiatric symptoms when he has been incarcerated and consistently maintained on psychotropic medication." *Id.* at 28–29. For the reasons mentioned above, any inconsistency between Dr. Franklin's findings with any stabilization that Clark may have experienced when he was incarcerated is not a specific and legitimate reason to discount Dr. Franklin's conclusions. ALJ Welton should have considered the fact that Clark's symptoms have have been minimized as a

result of living in a highly structured setting.

Additionally, failing to review and consider Clark's medical records from his periods of incarceration is also not a specific and legitimate reason for discounting Dr. Franklin's opinion. It is worth noting that Dr. El Sokkary, like Dr. Franklin, relied on information provided by Clark and did not review Clark's prison medical records. AR 595. The fact that Dr. Franklin obtained and utilized reports from Clark instead of reviewing his prior medical records is not a sufficient reason to reject Dr. Franklin's findings because her conclusions are based on ample clinical testing. *See Ryan*, 528 F.3d at 1199–1200 ("[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." (citation omitted)). As discussed above, Dr. Franklin conducted numerous clinical tests and based her conclusions in large part on the results from those tests.

\* \* \*

Therefore, the Court finds that ALJ Welton erred at Step Three. ALJ Welton's conclusion that Clark's impairments did not meet or equal the medical severity of a listed impairment under 12.04 and 12.06 was not supported by substantial evidence, as he failed to provide specific and legitimate reasons for rejecting the opinions of Dr. Raj and Dr. Franklin.

### D. ALJ Welton Erred in Determining Clark's RFC

At Step Four, ALJ Welton relied in part on his findings as to the 'paragraph B' criteria for listings 12.04 and 12.06 in determining Clark's residual capacity finding. Therefore, the legal errors discussed above with respect to Step Three also infect his determination of Clark's residual functional capacity. The Court further concludes that the ALJ failed to provide adequate reasons for rejecting the testimony of Clark's mother, Dr. Bai's findings concerning Clark's use of a cane, and Dr. Chen's findings concerning Clark's use of a cane.

#### 1. Credibility of Clark and His Mother

##### a. The ALJ Did Not Err in Assessing Clark's Credibility

"[T]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Reddick*, 157 F.3d at 722 (9th Cir. 1998). "The ALJ's

findings, however, must be supported by specific, cogent reasons." *Id.* "In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (citation omitted); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012).

"First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Ligenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citation omitted); *see also Molina*, 674 F.3d at 1112.

"Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Ligenfelter*, 504 F.3d at 1036 (internal quotation marks and citation omitted); *see also Molina*, 674 F.3d at 1112; *Valentine*, 574 F.3d at 693; *Vasquez*, 572 F.3d at 591–93 (concluding that an ALJ failed to provide "specific, clear, and convincing" reasons to support an adverse credibility determination). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) (quoting *Lester*, 81 F.3d at 834); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014) ("Although the ALJ's analysis need not be extensive, the ALJ must provide some reasoning in order for us to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence.").

"In evaluating the credibility of pain testimony after a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain." *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). "An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment. However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide specific, cogent reasons for the disbelief." *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (internal quotation marks and citations omitted). The ALJ is required to "cit[e] the reasons why

the [claimant's] testimony is unpersuasive." *Id.* (alterations in original; citations omitted).

"Where, as here, the ALJ did not find affirmative evidence that the claimant was a malingerer, those reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* (internal quotation marks and citations omitted).

ALJ Welton satisfied the first step of the two-step inquiry regarding Clark's testimony. In his decision, ALJ Welton found that Clark's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." AR 30; *Ligenfelter*, 504 F.3d at 1036. Second, because ALJ Welton did not identify any evidence of malingering,[8] he was required to support his finding that Clark's testimony was not credible with clear and convincing reasons. *Ligenfelter*, 504 F.3d at 1036. ALJ Welton employed the wrong legal standard when he noted that he found "specific and legitimate reasons" for discrediting Clark's testimony. *Id.* at 29. He should have employed the clear and convincing standard. The clear and convincing standard "is not an easy requirement to meet," as it is "the most demanding [standard] required in Social Security cases." *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

The first reason that ALJ Welton provided as a basis for rejecting Clark's testimony is Clark's "history," namely, that Clark had periods of stability and improvement "with treatment and with abstinence from alcohol and drugs" while incarcerated. AR 29. For the reasons discussed above, this is not a clear and convincing reason to reject Clark's testimony that he is disabled. *Garrison*, 759 F.3d at 1017–1018. While Clark may have experienced periods of improvement with respect to some of his symptoms while he was incarcerated, "the record reveals a tortuous path," *Garrison*, 759 F.3d at 1018, in that Clark often continued to experience

---

[8] ALJ Welton noted Dr. Franklin's conclusion that Clark's reporting should be considered with caution due to his elevated M-FAST score, but stopped short of asserting that Clark was malingering. AR 27. Because the Court concludes that ALJ Welton's reasons for rejecting Clark's testimony satisfy even the higher "clear and convincing" standard, however, the determination of whether a "specific and legitimate" standard would be appropriate in light of evidence of malingering does not affect the outcome. *See Mobbs v. Berryhill*, No. 3:17-CV-05374-TLF, 2017 WL 6759321, at *6 (W.D. Wash. Dec. 29, 2017) (holding that the "specific and legitimate" standard applies if there is evidence of malingering).

psychiatric symptoms while incarcerated and receiving consistent medical attention. AR 733 ("hearing voices and seeing shadows" months into a period of incarceration despite expressing a desire to meet with a psychiatrist "for several months"), 760 ("bouts of uncontrollable crying" even after having been incarcerated and having received medical attention for months), 773 ("ongoing anxiety" described as "paranoia" after months of incarceration and consistent medical care).

The second basis that ALJ set forth in support of finding Clark's testimony not credible was Clark's daily activities. According to ALJ Welton, Clark's "activities since his alleged disability onset date also undermine the allegations of his disabling symptoms." AR 29. "While a claimant need not 'vegetate in a dark room' in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting." *Molina*, 674 F.3d at 1112–13 (citations omitted). Moreover, "[e]ven when those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Id.* (citations omitted). Here, ALJ Welton noted that Clark "told the Administration and Dr. El Sokkary that he was able to perform a variety of daily activities" such as mowing the lawn, going shopping, collecting cans, driving, doing light cooking, doing laundry, taking care of his dog, and washing dishes. AR 29–30. He further noted that, "contrary to the claimant's allegations of disabling pain precluding him from performing any work since December 15, 2007, he told his physician in September 2013 that he had injured his right knee while lifting an engine into his car" and later reported in November 2013 that he "injured his left leg after striking it with a sledgehammer." AR 30. Taken together, the activities in the record sufficiently contradict Clark's allegations of disabling pain precluding him from all work. ALJ Welton gave a specific, clear, and convincing reason for rejecting Clark's testimony.

The third reason that ALJ Welton gave in support of rejecting Clark's testimony is that Clark has been inconsistent in his reports concerning his use of a cane as well as his history of drug use. *Id.* at 30. ALJ Welton noted that Clark told physicians that he had been prescribed a cane even though "there is no evidence that any physician recommended or prescribed a cane

54

other than for a short period of time." *Id.* The fact remains, however, that he had been prescribed a cane, and that is what Clark has reported. *Id.* at 678, 699–701, 271. Accordingly, the Court finds no inconsistency in the record with respect to Clark's use of a cane.

With respect to Clark's inconsistent statements concerning his drug use, ALJ Welton correctly identified that Clark reported in March 2010 that he had used methamphetamine and later told a physician in April 2010 that he had abstained from methamphetamine use for eight years. *Id.* at 30, 350, 370. The Ninth Circuit has held that, in "determin[ing] whether the claimant's testimony regarding the severity her symptoms is credible, the ALJ may consider . . . ordinary techniques or credibility evaluation," including a "claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid." *Smolen*, 80 F.3d at 1284. The Ninth Circuit has also held that inconsistent statements concerning drug or alcohol use can constitute specific, clear, and convincing reasons for rejecting a claimant's testimony. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002); *Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999) (holding that the ALJ provided clear and convincing reasons for discrediting claimant's testimony, including that the claimant's "testimony and various statements regarding his drinking were not consistent"). For example, in *Thomas v. Barnhart*, the Ninth Circuit held that "[t]he ALJ gave specific, clear and convincing reasons for discounting [the claimant's] testimony," including that the claimant "had not been a reliable historian, presenting conflicting information about her drug and alcohol usage." *Thomas*, 278 F.3d at 959. Here, too, Clark gave conflicting information about his drug use to physicians, and the Court concludes that the ALJ gave a specific, clear, and convincing reason to discredit Clark's symptom testimony. AR 29, 350, 370.

### b. The ALJ Erred in Assessing Clark's Mother's Credibility

The Ninth Circuit has made clear that "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, . . . and therefore cannot be disregarded without comment." *Nyugen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)); *see also Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (holding that "[d]isregard" of descriptions by friends and family members in

a position to observe a claimant's symptoms and daily activities "violates the Secretary's regulation that he will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work") (citing 20 C.F.R. § 404.1513(e)(2)); *Lewis*, 236 F.3d at 511 ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.").

ALJ Welton did not provide any reasons for specifically rejecting Clark's mother's third party function report from October 2013. The Ninth Circuit does not "require[] the ALJ to discuss every witness' testimony on an individualized, witness-by-witness basis." *Molina*, 674 F.3d 1114. The court elaborated that "if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Id.* (citing *Valentine*, 574 F.3d at 694). As discussed above, one germane reason that ALJ Welton gave for rejecting Clark's testimony was that he gave inconsistent reports to his physicians concerning his drug use. AR 29, 350, 370. The third party function report that Clark's mother submitted, however, did not contain any similar inconsistencies. *See id.* at 302–309. Her report did not address Clark's history of drug use at all. *Id.* The other germane reason that ALJ Welton gave for rejecting Clark's testimony was that his allegations of disabling pain were contradicted by his disabling activities. *Id.* at 29–30. ALJ Welton cited Clark's mother's function report responses in support of that conclusion. *Id.* at 30. Nothing in her function report responses conflicts with ALJ Welton's determination regarding Clark's daily activities. Accordingly, ALJ Welton erred when he failed to provide a germane reason for rejecting Clark's mother's report.

### 2. Dr. Bai, Dr. Chen, the State Agency Medical Consultant, and Clark's Use of a Cane

ALJ Welton's assessment of Clark's residual functional capacity does not include the use of a cane. In making that determination, ALJ Welton attributed "great weight to the opinion of the State Agency consultant" that Clark could perform light work. AR 28. As discussed above, it is unclear which consultant ALJ Welton is referring to because he failed to provide the consultant's name and because the exhibit he cited contains the names of numerous physicians. *Id.* 110–29.

ALJ Welton also gave "[g]reat deference" to the opinions of Drs. Bai and Chen, but he rejected their conclusions that Clark needed a cane for longer periods of ambulation or when ambulating on uneven surfaces. *Id.* at 28, 567, 602. While ALJ Welton did not address Dr. Chen's determination that Clark needed a cane for longer periods of ambulation or for ambulation on uneven surfaces, he found that Dr. Bai's similar conclusion was "entitled to no weight as there is no evidence that any physician has recommended that the claimant use a cane, other than for a limited period of time." *Id.* at 28.

Even assuming that the state agency consultant's findings conflict with those of Drs. Bai and Chen, the fact that Clark has been prescribed the use of a cane for limited periods of time is not a specific and legitimate reason to reject their conclusions that he should be able to use a cane for longer periods of ambulation and for uneven surfaces. It is worth noting that the physicians who treated Clark and prescribed the use of a cane saw Clark while he was incarcerated for limited amounts of time. *Id.* at 388, 393, 515. These prescriptions for a cane were often for the duration of time he was incarcerated or fail to contain a specific cutoff date. *Id.* at 513, 678, 819, 821. There is no indication that those doctors contemplated that Clark would be walking for long distances or on uneven surfaces that might arise in a work setting. To the contrary, their notes are focused on accommodating Clark within a prison setting, such as making sure he had access to a handicapped shower and a bottom bunk. *Id.* at 388, 390, 678. To the extent that Clark faced any likelihood of encountering longer distance walking or uneven surfaces, the prison doctors prescribed a cane for appointments and court appearances. *Id.* at 388. Accordingly, the Court concludes that to the extent any of Clark's prescriptions for a cane were of a limited duration, it is not a specific and legitimate reason to reject the conclusions of Drs. Bai and Chen because the prescriptions addressed Clark's immediate needs in prison as opposed to potential demands of a work setting. ALJ Welton should have allowed for Clark's use of a cane when he crafted Clark's residual functional capacity determination.

* * *

For the reasons discussed above, ALJ Welton erred at Step Four and his conclusions are not supported by substantial evidence because ALJ Welton failed to provide germane reasons for

57

rejecting the testimony of Clark's mother as well as specific and legitimate reasons for rejecting the findings of Drs. Bai and Chen.

### E. Whether the Court Should Remand for Further Proceedings or for Award of Benefits

If an ALJ has improperly failed to credit claimant testimony or medical opinion evidence, a district court must credit that testimony as true and remand for an award of benefits if three conditions are satisfied:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison*, 759 F.3d at 1020. Under such circumstances, a court should not remand for further administrative proceedings to reassess credibility. *See id.* 1019–21. This "credit-as-true" rule, which is "settled" in the Ninth Circuit, *id.* at 999, is intended to encourage careful analysis by ALJs, avoid duplicative hearings and burden, and reduce delay and uncertainty facing claimants, many of whom "suffer from painful and debilitating conditions, as well as severe economic hardship." *Id.* at 1019 (quoting *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1399 (9th Cir. 1988)). A court may remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Garrison*, 759 F.3d at 1021. A court may also remand "when, even if the evidence at issue is credited, there are 'outstanding issues that must be resolved before a proper disability determination can be made," such as ambiguity as to when the claimant's disability began. *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010) (quoting *Vasquez v. Astrue*, 572 F.3d 586, 593 (9th Cir. 2009)). Outside of such circumstances, however, a "district court abuse[s] its discretion by remanding for further proceedings where the credit-as-true rule is satisfied and the record afford[s] no reason to believe that [the claimant] is not, in fact, disabled." *Garrison*, 759 F.3d at 1021.

Here, the Court finds that the record has been fully developed, ALJ Welton failed to

provide legally sufficient reasons for rejecting evidence, and that if the improperly credited evidence were created as true, ALJ Welton would be required to award benefits. First, as discussed above, ALJ Welton improperly disregarded the opinions of Drs. Raj and Franklin at Step Three. Crediting their evidence, Clark would satisfy the 'paragraph B' criteria of listings 12.04 and 12.06 because he has at least two marked impairments. Dr. Raj found that Clark had numerous marked restrictions in maintaining concentration, persistence or pace. AR 580. Dr. Raj also determined that Clark had one marked and two extreme restrictions in maintaining social functioning. *Id.* Similarly, Dr. Franklin found that Clark had marked restrictions in maintaining concentration, persistence, or pace. *Id.* at 987. She also concluded that Clark had extreme restrictions in maintaining social functioning. *Id.* Crediting those opinions, Clark is disabled under listings 12.04 and 12.06. Second, ALJ Welton failed to address the descriptions of Clark's physical and mental limitations offered in the third party function report written by Clark's mother. Her descriptions support the conclusion that Clark would have extreme limitations in maintaining social functioning. *Id.* at 307–08. Additionally, the Court finds that the records as a whole does not "create[] serious doubt as to whether [Clark] is, in fact, disabled within the meaning of the Social Security Act." *Garrison*, 759 F.3d at 1021. The credit-as-true rule therefore applies, and remand for an award of benefits is appropriate.

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS Clark's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, and REMANDS this case to the Commissioner for an award of benefits.

**IT IS SO ORDERED.**

Dated: August 2, 2018

_____
JOSEPH C. SPERO
Chief Magistrate Judge